**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-00827-NYW

ESTATE OF JOHN KOWALSKI, by and through its P.R. DENISE KOWALSKI,

      Plaintiff.

v.

SHERIFF JEFF SHRADER, *et al*.

      Defendants.

---

**PLAINTIFF'S RESPONSE TO SHERIFF DEFENDANTS' MOTION TO DISMISS**

---

      Plaintiff, Estate of John Mr. Kowalski, by and through its attorneys, Raymond K. Bryant, Rachel B. Maxam, and Zach Shiffler of the Civil Rights Litigation Group, PLLC, hereby responds in opposition to Sheriff Defendants' Motions to Dismiss, as follows:

**<u>INTRODUCTION AND BACKGROUND</u>**

      This is a civil rights action for the death of John Mr. Kowalski resulting from deliberate indifference to his serious medical needs. While in custody, Mr. Kowalski suffered from opiate withdrawal and passed out and had a seizure in the shower. Later that day, Mr. Kowalski became gravely ill and went into cardiac arrest. His cellmate activated the emergency call button repeatedly and yelled and pounded on the cell door desperately trying to get the attention of deputies to come help Mr. Kowalski. Defendant deputies nearby in the control workstation who were aware of Mr. Kowalski's medical issues saw and/or heard the emergency call light/alarm indicator for Mr. Kowalski's cell signal an emergency for at least 20 minutes but deliberately ignored it. By the time a deputy stopped by the cell during his regular walkthrough, Mr. Kowalski had been deprived of oxygen to his brain for too long and he later died.

The Jail Defendants (referred to as the "Sheriff Defendants" in the Motion to Dismiss) seek dismissal of all claims against them based on fallacious mischaracterizations of the Complaint as alleging that there was deliberate indifference to common "withdrawal symptoms" in order to suggest Defendants would have had no way of knowing Mr. Kowalski was suffering from a serious medical emergency. Defendants' motion disingenuously attempts to sidestep Mr. Kowalski's medical emergency by re-characterizing the "<u>emergency</u> call button" as just a "call button" and ignoring the totality of the circumstance and facts known to the Defendants at the critical time Mr. Kowalski was dying due to the lack of medical care. Defendants ignore an alarming pattern of inmates dying in JCDF custody by dismissively suggesting that the manner in which other inmates were ignored-to-death was too "dissimilar" to the way in which Mr. Kowalski was ignored. However, Plaintiff's Complaint states a plausible claim for relief and by detailing the failure to timely respond to a medical emergency, which is a clearly established right. As a result, Defendants' motion should be denied.

## **<u>LEGAL STANDARDS</u>**

Under Rule 12(b)(6), a defendant may move to dismiss for failing to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive such a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable. *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013). In reviewing a motion to dismiss, the court accepts the facts alleged in the complaint as true and views them in the light most favorable to the plaintiff. *See e.g., Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011; *see also Iqbal*, 556 U.S. at 678. Viewing the complaint in this

manner, a court must decide whether the plaintiff's allegations give rise to more than speculative possibilities. *Id*.

## ARGUMENT

### I.     Applicable Constitutional Standard.

The Defendants have attached to its motion an order indicating that Mr. Kowalski admitted to a probation violation just before the incarceration period at issue in this case, and, thus, that he was remanded to jail as a convicted prisoner. Plaintiff was unaware of this order at the time the Complaint was filed, as Mr. Kowalski is deceased and the records available at the time suggested only that Mr. Kowalski was being detained on a probation violation. Accordingly, Plaintiff's Complaint contains a minor technical error by stylistically raises its deliberate indifference claims under the Fourteenth Amendment applicable to pretrial detainees instead of the Eighth Amendment applicable for those serving a sentence. Defendants seek dismissal of the Complaint on this basis. But, as Defendants point out, this does not change the substance or legal analysis of the claims. As discussed *infra*, Plaintiff has meritorious claims under the Eighth Amendment. Defendants' citations do not suggest that misstyling the deliberate indifference claim under the wrong constitutional amendment is fatal. Complete dismissal with prejudice is only appropriate if the plaintiff had no plausible claims for relief under any constitutional theory due to qualified immunity. *See Session v. Franco*, 19-CV-03161-PAB-KLM, 2021 WL 769450, at *4 (D. Colo. Jan. 27, 2021); See also *Reynoldson v. Shillinger*, 907 F.2d 124, 127 (10th Cir. 1990). Given that the plaintiff may amend the Complaint after responsive pleading has been filed with the opposing party's consent or leave of the Court. Fed. R. Civ. P. 15(a)(2), Plaintiff has conferred with the Defendants and obtained agreement that the Court may consider the claim to have been raised

and/or considered to be amended to be raised under the Eighth Amendment.[1] Accordingly, in the interest of justice, judicial economy in not refiling these briefs, unnecessary delay, and a speedy just, speedy, and inexpensive determination of this action, Plaintiff requests that the Court address the merits of the motion under the applicable standard.

## II.    The Jail Defendants Should Not Be Dismissed Because the Complaint Has Alleged a Deliberate Indifference Claim and the Right is Clearly Established.

The Defendants' Motion relies on an erroneous re-characterization of the Complaint by ignoring, misrepresenting, and reframing the key allegations and facts to create a strawman argument. The Defendants' Motion on deliberate indifference seeks "dismissal" of a "claim" the Plaintiff has not made: that the Jail Defendants were deliberately indifferent to Mr. Kowalski's "withdrawal symptoms." In reality, Plaintiff has alleged that the Jail Defendants were deliberately indifferent to the serious medical needs of Mr. Kowalski by failing to timely respond to the medical emergency of a catastrophic cardiac event (arrhythmia and arrest) as a result of ignoring the emergency call button and his cellmate yelling and pounding on the door for help when they knowledge that Mr. Kowalski was in withdrawal, had passed out in the shower, seized, and was otherwise being gravely ill. Properly viewing the actual allegations of the Complaint and relevant law and facts, Plaintiff has stated a claim for a constitutional violation based on clearly established law. Accordingly, Defendants' Motion should be denied.

### A. The Estate Has Sufficiently Alleged That the Jail Defendants Were Deliberately Indifferent to Mr. Kowalski's Medical Emergency.

The Defendants falsely characterized Plaintiff's Complaint as alleging that the Jail Defendants were deliberately indifferent to Mr. Kowalski's medical needs related to "withdrawal

---

[1] Alternatively, Plaintiff could file a formal amended complaint. However, to avoid unnecessary delay, the Parties agree that the same substantive challenges would be raised and will inevitably have to be decided. Thus, in order to avoid mooting out the responsive pleadings that point to the operative Complaint, the parties ask that the merits of the motion be considered now, and if an amended complaint must be filed Plaintiff will do so after resolution.

symptoms" and attempt to minimize allegations supporting deliberate indifference by falsely framing the allegations as being that they did not respond more "quickly" to the "call button" and ignoring the totality of the facts. Doc. 12 at 5-14. However, Plaintiff's Complaint makes no claims of "deliberate indifference" to "withdrawal." Mr. Kowalski did not die from ordinary withdrawal symptoms like vomiting and diarrhea. In reality, Plaintiff has alleged that the Jail Defendants were deliberately indifferent to the medical <u>emergency</u> (cardiac arrhythmia and arrest) suffered by Mr. Kowalski by ignoring the <u>emergency</u> call button and his cellmate, John Barajas, yelling and pounding on the door for help when they had prior knowledge of Mr. Kowalski having medical issues. *See* Doc. 1 at 70, 99. Fifteen to twenty minutes passed until Defendant Gonzales discovered that Mr. Kowalski had no pulse after Mr. Barajas got his attention when he was doing an ordinary "walkthrough." *Id.* at 70, 72-75. The fact that was Mr. Kowalski was in opioid withdrawal, which can lead to death due to dehydration (Doc. 1 at 30-34), along with also passing out and seizing (*Id.* at 28, 50), not getting out of bed when required for headcount (*Id.* at 68), vomiting, not eating and drinking, and otherwise looking severely ill (*Id.* at 55), combined with the cellmate yelling and pounding on the door and repeatedly pushing the emergency call button (*Id.* at 59-65), are all <u>facts</u> that put the Jail Defendants on <u>notice</u> that Mr. Kowalski was having a serious medical <u>emergency</u> at the time he was going into cardiac arrest and not just experiencing "<u>withdrawal symptoms</u>." *Id.* at 69. The Jail Defendants all knew or should have reasonably known based on the totality of these facts that Mr. Kowalski was having a serious medical emergency. *Id.* at 69, 99. They acted with deliberate indifference by failing to obtain and provide him with medical treatment in a timely and appropriate fashion when he was having a life-threatening medical <u>emergency</u>, not just at an innocuous time when he may have been having run-of-the-mill "withdrawal symptoms." *Id.* at 100, 104, 106.

1. **Objective Standard.**

Under the objective inquiry of deliberate indifference, the Court examines if "[a] medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or ... is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (*quoting Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). Opioid withdrawal symptoms, such as vomiting and diarrhea, in and of themselves have not been recognized by the Tenth Circuit as sufficiently serious medical need to be within the deliberate indifference framework. *Quintana v. Santa Fe Cty. Bd. of Commissioners,* 973 F.3d 1022, 1029 (10th Cir. 2020). However, the Tenth Circuit has specifically recognized that "<u>severe</u>" and "<u>dangerous</u>" opioid withdrawal symptoms are something a jury could depend on to conclude that the seriousness of the medical risks associated would be obvious to any reasonable observer. *Id.* at 1029-30 (emphasis added). A majority of other courts make no such distinction between less-serious withdrawal symptoms and more severe symptoms and have held that opiate withdrawal amounts to a serious medical need on its face. *See*, *e.g*., *Foelker v. Outagamie Cty.*, 394 F.3d 510, 513 (7th Cir. 2005).

Here, Mr. Kowalski was not just suffering from ordinary withdrawal symptoms but suffered cardiac arrhythmia and arrest – symptoms of *severe* withdrawal (or possibly another serious medical condition) at the critical time he was ignored by the Jail Defendants. Moreover, he had passed out and seize earlier in the day, was not eating, drinking, or getting out of bed, and looked extremely ill. Such a serious combination of medical issues would be plainly obvious to any reasonable observer as being more than just "common withdrawal symptoms." *See, e.g.,* 973 F.3d at 1033 (conduct violated clearly established law by consciously disregarding obvious symptoms not just of heroin withdrawal but of a serious internal injury).

Delay in medical care constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm. *See Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir.1993). Ultimately, judicial recognition of an objectively serious medical condition does not depend on detention staff's perceptions of symptoms related to the injury at the time of the incident, it depends on the substantiality of the final harm suffered. *See Mata v. Saiz,* 427 F.3d 745, 753-754 (10th Cir. 2005) (contrasting the ultimate actual harm suffered by a complainant against the perception or symptoms of harm that were exhibited at the time of the incident). For claims involving delayed medical care, the requirement of substantial harm may be satisfied by allegations of intermediate injury such as the pain experienced while waiting for treatment and analgesics. *Kikumura v. Osagie,* 461 F.3d 1269, 1292 (10th Cir. 2006) (quoting *Sealock v. Colorado,* 218 F.3d 1205, 1210 (10th Cir. 2000)). The substantial harm requirement may also be met by the more traditional ultimate harm of "lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir.2001). The symptoms and emergency issues that ultimately led to plaintiff's death are, thus, sufficient for the first prong of the inquiry.

**2.  Subjective Standard.**

Under the subjective inquiry of deliberate indifference, the Court examines if an official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Whether a prison official possessed the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. *Mata v. Saiz,* 427 F.3d 745, 752 (10th Cir. 2005).

The Jail Defendants disregarding obvious signs of risk of serious harm when they ignored the emergency call button alert and Mr. Barajas pounding on the door and yelling for help in light of the fact that they knew Mr. Kowalski was not only in withdrawal but had passed out and seized earlier that day. With knowledge that Mr. Kowalski's medical issues were more serious than just "common withdrawal symptoms," they disregarded a substantial risk of serious harm (cardiac arrest and death) to Mr. Kowalski by not timely responding to what they reasonably should have known was a medical emergency.

Deliberate indifference by jail guards can arise by intentionally denying or delaying access to medical care. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Deliberate indifference also arises when an inmate does not receive timely medical care, including emergent medical care or where medical care is denied when there are "recognizable symptoms which potentially create a medical emergency." *See e.g.*, *Burke v. Regalado*, 935 F.3d 960, 994 (10th Cir. 2019) (officers ignored and failed to rely to medical staff that there was an obvious medical crisis); *Al-Turki v. Robinson*, 762 F.3d 1188, 1194–95 (10th Cir. 2014) (Defendant ignored Plaintiff's repeated complaints of severe abdominal pain and requests for medical assistance, thus completely denying him any medical care "although presented with recognizable symptoms which potentially create[d] a medical emergency); *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir.2006); 427 F.3d at 757; *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (subjective standard met where jail guard refused to provide emergency medical care to inmate with symptoms of heart attack); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (Deliberate indifference is shown when an inmate is denied access to medical personnel capable of evaluating the need for treatment); *Young v. Glanz*, 13-CV-315-JED-JFJ, 2020 WL 5937899, at *4 (N.D. Okla. Oct. 6, 2020) (jail medical and detention staff were deliberately indifferent by observing critical symptoms that clearly called for emergency

medical care, but failed to act); *See also Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir.1985) (fifteen minute delay in treating inmate in cardiac arrest may violate Eighth Amendment). A prisoner may satisfy the subjective component of deliberate indifference by showing that even a brief delay caused unnecessary pain or worsening of the condition. 427 F.3d at 755.

Defendants argue that "[n]owhere does the Complaint suggest that [Jail Defendants] precluded Mr. Kowalski from receiving medical care." Doc. 12 at 14. Similarly, Defendants also frame Plaintiff's grievances of the Defendants' actions as them not responding to the emergency call button more "quickly" or "immediately" to diminish the spectre of deliberate indifference to Mr. Kowalski dying while they went about ordinary business. Doc. 12 at 11. Accordingly, it is also important to note that Defendants Johnson, Bennett, and Taborsky *never* did anything to respond to the emergency call button and Mr. Barajas pounding on the door and yelling for help. Doc. 1 at 72. Defendant Gonzales did not so much as respond specifically to Mr. Kowalski's cell, but rather started his regular "walkthrough" of the unit to monitor all inmates and only "responded" when Mr. Barajas flagged him down. *Id*. at 72-75.

This delay in a "response" was critical. At the time Mr. Barajas was pressing the emergency call button and yelling for help, Mr. Kowalski was struggling to breathe and not responsive. Doc. 1 at 56. By the time Deputy Gonzales was flagged down by Mr. Barajas and he discovered Mr. Kowalski had no pulse, started CPR, and called medical personnel, Mr. Kowalski had been deprived of oxygen to his brain for at least 15 minutes and was likely already brain dead and would never recover. Doc. 1 at 75-80. Defendants clearly precluded and/or caused a critical delay in Mr. Kowalski receiving medical care at the crucial time he went from cardiac arrhythmia to his heart stopping and no oxygen getting to his brain which ultimately led to his death.

Defendants argue that Mr. Barajas "generically" yelling "help" and "hey" while repeatedly pressing the emergency call button would not put them on alert that there was a serious medical emergency and they had no specific knowledge that would have put them on notice of the particular risk of harm to Mr. Kolwalski. Doc. 12 at 10-12. Needless to say, someone yelling "help" comes with the blatantly obvious inference that there is an emergency. Moreover, the Seventh Circuit has held that the emergency call button is a "clear indication that an emergency was at hand" and rejected the idea that specific awareness by officers of the particular nature of the danger at issue did not mean the officer did not have knowledge of a serious risk of harm. *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005) (finding deliberate indifference where an inmate provided notice to guards by pressing the emergency call button just before being raped at knifepoint). The risk of harm of not responding to an emergency call button alert being repeatedly pressed by someone yelling for help is obvious to the "reasonable man." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001).

The Jail Defendants might not have known the nature of the medical issue that created the substantial risk of harm (cardiac arrest), but that is not dispositive. It is not necessary that Defendants know of the precise medical issue that creates a substantial risk of harm, only that they know there is one. *See, e.g.*, *Layton v. Bd. of Cty. Comm'rs of Oklahoma Cty.*, 512 Fed. Appx. 861, 869 (10th Cir. 2013) (citing *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (official need not have knowledge of the particular manner in which injury might occur); *Al-Turki*, 762 F.3d at 1194 (ignoring symptoms of a life-threatening medical condition is an Eighth Amendment violation in and of itself regardless of the nature of the cause). Based on the other information available at the time of the emergency, it may be inferred that Defendants knew Mr. Kowalski was in the midst of a heart attack, stroke, or other medical crisis (Doc. 1 at 26-27) and that is why Mr.

10

Barajas was pounding on the door, yelling "help," and repeatedly pressing the emergency call button. The fact that the Defendants had knowledge of him being in withdrawal, passing out, seizing, and then being placed in a special cell to be watched only amplifies the deliberate indifference to the likelihood that the emergency call button going off and Mr. Barajas pounding on the door and yelling for help was an indication of a major medical emergency. What matters is that the Jail Defendants were "aware of a serious risk of harm in some form" and should have responded to the emergency alerted, regardless of the underlying cause. 395 F.3d at 736.

Defendants also suggest that the fact that Mr. Kowalski was on withdrawal protocol and is supposed to be checked on by medical personnel at specific times during the day (9 am, 4 pm, and 11 pm somehow absolves them of any responsibility to provide Mr. Kowalski access to emergency medical care. Doc. 12 at 11, 14. The Defendants effectively offer that there is no duty to respond to a medical emergency if the inmate is or has been provided some kind of medical care of any type or at any other time. But this, too, overlooks the obvious. The emergency call button was designed to alert detention staff, not medical personnel, to an emergency that might not be identified during timed check-ups. Thus, earlier medical contact cannot absolve them of the need to react when emergency circumstances arise.

### B. Jail Defendants Are Not Entitled to Qualified Immunity Because the Right is Clearly Established.

The Tenth Circuit does not require a favorable ruling on a case with the exact same set of facts as the case at bar to deny a governmental official qualified immunity. He need only (1) "identif[y]" a factually similar "Supreme Court or published Tenth Circuit decision," (2) show that "the clearly established weight of authority from other courts [has] found the law to be as [he] maintains," or (3) show that "the unlawfulness of the [officers'] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Jones v. Manriquez*, 811 Fed.

Appx. 482, 489 (10th Cir. 2020). Contrary to Defendants' assertions, there need not be a case "on-point." *McCowan v. Morales*, 945 F.3d 1276, 1285 (10th Cir. 2019) ("there need not be a prior 'case directly on point,' so long as there is existing precedent that places the unconstitutionality of the alleged conduct 'beyond debate'). [Q]ualified immunity will not be granted if government defendants fail to make "reasonable applications of the prevailing law to their own circumstances." *Masters v. Gilmore,* 663 F. Supp. 2d 1027, 1044 (D. Colo. 2009).

Defendants' Motion on the basis of qualified immunity suffers from the same false premise that Plaintiff's claim is for deliberate indifference to "opioid withdrawal risk" and the mischaracterization of Plaintiff's Complaint as alleging a "right" to an immediate response to a "call button" to which they cannot locate any case that establishes such a right. *See* Doc. 12 at 12-14. Again, Defendants conveniently ignore the fact that it's an "emergency call button" to try to downplay the totality of the facts that point towards the fact that the Defendants should have known there was a serious medical emergency requiring an immediate response and not something to address when Deputy Gonzales got around to stopping by Mr. Kowalski's cell during ordinary rounds. Doc. 1 at 72-73. More importantly, this argument oversimplifies the nature of the "right" at issue. The "right" at issue is not just a "response" to a "call button" but a response to a medical emergency – all in light of the fact that not only was the emergency call button being pressed, but Mr. Barajas was pounding on the door and yelling for help and the Defendants were aware of Mr. Kowalski's medical issues above and beyond typical withdrawal symptoms. There is unquestionably a right to a timely emergency medical response and treatment for "*severe*" and "*dangerous*" opioid withdrawal symptoms because these are "obvious and serious medical needs." *See Burke,* 935 F.3d at 994, *et. al., supra*; 973 F.3d at 1033; *See also*, *Hope v. Welty*, *et. seq.*, *infra.*

Even viewing this case in Defendants' narrow lens of the "right" at issue, being "to an immediate response" to an emergency call button alert, the weight of prevailing authority supports that Defendants' claims cannot be dismissed on the basis of qualified immunity. In *Velez,* the Court held that the officer's failure to adequately respond to a pretrial detainee's emergency call button during an assault by his cellmate violated the detainee's constitutional rights precisely because the emergency call button provided sufficient notice to understand an emergency was occurring. 395 F.3d at 735-36. The defendant officer "did not have to know the specifics of the danger to be culpable." *Id*. Relying on *Velez*, District courts across the country have likewise held that a constitutional violation occurred where officers delayed in responding or failed to respond to an emergency call button alert when an emergency was taking place, including emergencies related to opioid withdrawal. *Hope v. Welty*, No. 316CV00327NJRDGW, 2018 WL 7960378, at *4 (S.D. Ill. Nov. 15, 2018), *report and recommendation adopted*, No. 16-CV-327-NJR-MAB, 2019 WL 442335 (S.D. Ill. Feb. 5, 2019); *Hekenberger v. Intake Officer*, No. 17-C-619, 2017 WL 2389619, at *3 (E.D. Wis. June 1, 2017) (involving opioid withdrawal); *Cunningham v. Does 13-18*, No. 17-CV-0124-SMY, 2017 WL 1077053, at *2 (S.D. Ill. Mar. 22, 2017); *Petty v. Kemp*, No. 15-CV-111-MJR, 2015 WL 800361, at *2 (S.D. Ill. Feb. 25, 2015); *Glover v. Gartman*, 899 F. Supp. 2d 1115, 1149-50 (D.N.M. 2012); *O'Neil v. Texas Dep't of Criminal Justice*, 804 F. Supp. 2d 532, 537 (N.D. Tex. 2011) (officers failed to respond to emergency call button and verbal calls for help); *Tillman v. Sheriff of Broward Cty*., No. 09-61631-CIV-UNGARO, 2010 WL 1366997, at *2 (S.D. Fla. Mar. 10, 2010), *report and recommendation adopted sub nom. Tillman v. Campbell*, No. 09-61631-CIV-UNGARO, 2010 WL 1367047 (S.D. Fla. Mar. 31, 2010); *Robinson v. Moran*, No. 06-CV-3058, 2008 WL 628708, at *17 (C.D. Ill. Mar. 5, 2008) (holding violation when delay in response was at least 10 minutes). Here, as in *Velez* and its progeny, the Jail Defendants knew

of and disregarded an excessive risk to inmate health or safety by failing to or delay in responding to an inmate's emergency call button where there was a substantial risk of serious harm. Accordingly, the right to an immediate response to the emergency call button, as Defendants have framed the right at issue, is clearly established.

Even if none of these cases are sufficiently factually similar, the right is nonetheless clearly established because Plaintiff can show that "the unlawfulness of the [officers'] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Jones,* 811 Fed. Appx. at 489. "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). From the summary reversals made in *Taylor v. Riojas* and *McCoy v. Alamu*, it is evident that the U.S. Supreme Court is disfavoring grants of qualified immunity for lack of a factually similar cases in circumstances where the impropriety and unconstitutionality of the officers' actions are plainly obvious. *Taylor v. Riojas*, 141 S. Ct. 52, 52–54 (2020) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (explaining that "'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question'" (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997))); 536 U.S. at 745; *McCoy v. Alamu*, 141 S. Ct. 1364, 209 L. Ed. 2d 114 (2021).

Here, it is plainly obvious that ignoring the emergency call button alert and a cellmate pounding on the door and yelling for help when an inmate has known medical issues would result in an inmate likely failing to receive critical emergency medical care to prevent serious injury or death. Following recent U.S. Supreme Court rulings, "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible" to ignore an inmate having a medical emergency. 141 S. Ct. at 53. The totality of the

facts makes it is so plainly obvious that there was an emergency requiring immediate medical attention that it was deliberate indifference to wholly ignore Plaintiff until it was too late. To hold that the officers here are entitled to qualified immunity would set a precedent that officers have no duty to respond to calls for help and provide medical care in light of known facts supporting that there was likely emergency situation. This would have application in any number of inmate emergencies where there are no factually similar cases on the underlying nature of the emergency (*e.g.*, *Velez infra*, where the emergency was being raped at knifepoint, or *O'Neil*, *infra*, where emergency was fatal asthma attack). No one can ever expect the nature of a particular medical emergency – but they can certainly recognize one is occurring based on facts like the emergency call button alert going off and/or yells for help in light of known inmate medical issues.

### C. The Estate Has Sufficiently Alleged a Supervisory Liability Claim Against Defendant Taborsky.

Defendants do not directly challenge the elements of the independent supervisory liability claim against Defendant Taborsky (Second Claim for Relief). Rather, they include Defendant Taborsky with the other deputies in arguing that they did not act with deliberate indifference and there was no clearly established right. However, to the extent Defendants challenge the claims against Defendant Taborsky under Rule 12 standards, Plaintiff has pled a plausible supervisory liability claim against Defendant Taborsky rooted in clearly established law.

Individual supervisory liability is appropriate where there is an affirmative link between a supervisor's acts and/or failure to act and a constitutional violation by subordinate officers. *Fogarty v. Gallegos,* 523 F.3d 1147, 1162 (10th Cir. 2008). An "'affirmative link' may be shown by either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Id.* Evidence of personal direction or knowledge of and acquiescence in a

constitutional violation suffice to meet these requirements. *Dodds v. Richardson,* 614 F.3d 1185, 1211 (10th Cir. 2010); *See also Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996).

As discussed *supra*, Plaintiff's Complaint states a plausible claim for relief sufficient to overcome qualified immunity because Taborsky was directly involved in the failure to provide care by causing and/or allowing his subordinates to ignore an obvious emergency confronting them. Defendant Taborsky not only had knowledge of the violation as it was ongoing but personally participated in it while he was present at the workstation with the other deputies conducting ordinary non-emergent business when the emergency call button was activated and Mr. Kowalski's cellmate was pounding on the door and yelling for help. Doc. 1 at 54, 58-72. Moreover, he failed to order detention officers to immediately check on Mr. Kowalski and acquiesced in their deliberated indifference to Mr. Kowalski's serious medical needs in light of the alert going off and all of the information known at that time. *Id.* at 110. Accordingly, he was not only deliberately indifferent himself, but failed also to act in his supervisory capacity by not ordering the deputies to respond. In so doing, he tacitly sanctioned deliberate indifference by all to Mr. Kowalski's serious medical needs. Accordingly, Plaintiff's Complaint states a plausible claim for relief against Defendant Taborsky in both an individual and supervisory capacity.

### III.   The Estate Has Sufficiently Alleged a *Monell* Claim.

To state a claim for municipal liability under §1983, a plaintiff must allege facts describing a practice, policy, or custom, whether official or unofficial, that is the moving force behind the constitutional deprivations alleged. *Bd. of County Com'rs v. Brown*, 520 U.S. 397, 403-404 (1997); *Mocek v. City of Albuquerque*, 813 F.3d 912, 933-944 (10th Cir. 2015). When a municipality is alleged to have caused a constitutional deprivation through inaction, or a failure to act, then a plaintiff must plead facts that establish that the municipality acted with deliberate indifference to

an almost inevitable constitutional violation. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted). "In most instances, notice can be established by proving the existence of a pattern of tortious conduct," which can take many forms. *Id.* Deliberate indifference may also be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations. *Id.* at 1307-08 (quoting *Brown*, 520 U.S. at 409; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 & n. 10, 109 S.Ct. at 1205 & n. 10 (1989).

The Defendants' Motion overlooks the fact that there are three bases for a *Monell* claim in the Complaint, not just one and merely conclude that Plaintiff's claim is not "plausible," "especially given the Complaint's allegations that [JCDF] has a medically administered protocol for individuals known to be withdrawing…" Doc. 12 at 16. However, Plaintiff has alleged a plausible claim for relief that 1) JCDF has failed to establish written policies regarding a deputy's responsibilities/obligations when an inmate presses the emergency call button; 2) JCDF has failed to provide training on the same and 3) JCDF has developed a practice and/or custom of permitting and acquiescing in its detention officers' disregard of inmate emergencies, including failing to respond to inmate communications about such emergencies. Doc. 1 at 83-84, 92, 94. This practice and/or custom is exemplified by at least five inmates (as known from public information sources) dying as a result of jail personnel failing to respond to medical emergencies when the emergency

call button was pressed. *Id*. at 86-91. These five instances of inmates dying after jail personnel ignored the emergency call button establishes actual notice that JCDF's policy and training deficiencies were substantially certain to result in a constitutional violation and it consciously or deliberately chooses to disregard the risk of harm, as evident by the fact that jail personnel continually ignore the emergency call button being utilized for medical emergencies. The lack of policies and training has led to a culture of deliberate indifference to inmate medical emergencies that are continually tolerated by JCDF. *Id*. at 93. This is further evidenced by the fact that no policies or training regarding the emergency call button have been instituted despite these repeated issues. *Id*. at 95.

In addition to identifying five other incidents in which inmates have died under similar circumstances the lack of policies and training regarding the responsibilities of employees to respond to emergency call buttons provides an independent basis to infer that the requisite deliberate indifference exists. Inmate medical emergencies are undoubtedly a recurring situation in jails that every Sheriff would be aware. Detention officers must have guidance and direction in how and when to respond to them in order to properly and consistently act to abate the risk of harm that inevitably results to inmates from such emergencies. Jails that completely lack policies and/or training regarding detention officer responsibilities when faced with clear notice of an emergency (like the alert from an emergency call button) are likely to cause and/or contribute to the failure to provide emergency medical care required by inmates. Thus, a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of the Sheriff's failure to act in this regard *Id*. at 1307-08 (quoting *Brown*, 520 U.S. at 409; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 & n. 10, 109 S.Ct. at 1205 & n. 10 (1989). In this instance, evidence of "a pre-existing pattern of violations" is unnecessary. *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019).

The Defendants' Motion includes no discussion regarding Plaintiff's claim that there are no policies or training on the emergency call button. The Defendants' *Monell* challenge, instead, relies on an assertion that the five cited incidences in the Complaint where inmates died due to the failure of personnel to respond to the emergency call button are "dissimilar" to the instant case and thus insufficient to provide "notice of any policy or training deficiencies." Doc. 12 at 16-18. The Defendants cite to no legal authority to support the degree to which or how prior instances discussed in the Complaint are "dissimilar" enough to negate *Monell* liability despite all of them involving personnel ignoring the emergency call button due to lack of policies and training. In reality, Plaintiff need only plead a pattern of "similar" instances of misconduct – "the more unique the misconduct is and the more similar the incidents are to one another, the smaller the number required." *See Araki v. Hess*, 2015 WL 7755975 *6 (D. Colo. December 2, 2015); *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015).

More importantly, Defendants slice too thinly in their criticism while overlooking the obvious. In each of the five incidents cited, a medical emergency occurred where notice was provided to detention officers by various means, including an emergency call button, and detention staff failed to timely respond to the medical need at issue, which resulted in severe harm and/or death. Whether stemming from an opioid withdrawal problem or not, JDCF staff appear to have a glaring problem with their ability to respond to medical emergencies. Moreover, several of the cited cases do involve complications associated with substance withdrawal that the jail has fundamentally failed to cure. These examples are more than sufficient to demonstrate a pattern of violations that have occurred that should have put the Sheriff on notice that fundamental changes must be instituted in order to prevent the pattern from continuing, which makes the lack of policies and training on these issues quite likely not only illustrative of a problem, but indicative of the

problems. Defendants improperly attempt to make this a fact-intensive inquiry instead of focusing on the legal standards which clearly support that Plaintiff has pled a plausible claim for relief that the prior jail instances provided JCDF extensive notice that there were policy and training deficiencies related to responding to the emergency call button and an informal custom of ignoring it. Defendants' vague argument about the jail having medical protocols for withdrawal is not availing. The existence of an opioid withdrawal protocol involving medical monitoring does not negate liability for jail personnel having a lack of policies and training on the emergency call button and engaging in a practice and/or custom of ignoring emergency call buttons when an inmate was having a medical emergency.

Defendants cite to *Leonhard v. Correct Care Sols., LLC*, 19-CV-00600-PAB-STV, 2020 WL 1694377, at *9 (D. Colo. Apr. 7, 2020), as amended (Apr. 8, 2020) to support their arguments that "factually distinguishable" cases can negate *Monell* liability. Doc. 12 at 16. In *Leonhard*, the Court dismissed the *Monell* claims because the prior lawsuits cited in the complaint "are not similar to the facts [in the instant case]." *Id.* at *9. None of the prior lawsuits cited in the complaint concerned mental health care or suicide, which was the basis of plaintiff's *Monell* claim. *Id.* at *8. Unlike the plaintiff in *Leonhard*, the Plaintiff here describes "specific findings" in the cited cases regarding deficient policy, training, and a custom of ignoring the emergency call button during a medical emergency – just as occurred in this case. *Id.* The prior instances and this case <u>are</u> factually similar, unlike *Leonhard*.

Defendants also assert that other jail events involving a failure of Jefferson County deputies to respond to the emergency call button cannot be considered in a municipal liability analysis because they happened *after* the Incident in this case. Doc. 12 at 17. However, Defendants' criticism confuses the concepts of "notice" for the purpose of identifying the need for policy

changes and/or training with evidence of an ongoing custom, policy, or practice, including the absence of policies or training, for the purpose of *Monell* liability. Post-incident conduct by Jefferson County deputies is only irrelevant when there is an absence of additional examples supporting the implicated pattern, practice, and/or failure to train/supervise in existence before the incident. *See Waller v. City and County of Denver,* 932 F.3d 1277, 1286-87 (10th Cir. 2019) (acknowledging that after-incident excessive force may arguably be used to show circumstantial evidence of municipal deficiencies). The pre-Incident jail events discussed in the Complaint provide *notice* of a municipal deficiency and evidence of a custom, policy, or practice. The post-Incident jail events discussed in the Complaint provide further evidence of an ongoing custom, policy, or practice and exemplify a culture of deliberate indifference. Doc. 1 at 96. Plaintiff's citation to post-Incident events is not dispositive of a *Monell* claim when there are pre-Incident events, it is just more evidence supporting *Monell* liability.

Respectfully submitted this 22nd day of June, 2021.

*s/  **Rachel B. Maxam***
Raymond K. Bryant
Rachel B. Maxam
Civil Rights Litigation Group, PLLC
1543 Champa St., #400
Denver, CO 80202
P:  720-515-6165
F:  720-465-1975
Raymond@rightslitigation.com
Rachel@rightslitigation.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of June 2021, a true and correct copy of the **PLAINTIFF'S RESPONSE TO SHERIFF DEFENDANTS' MOTION TO DISMISS** was electronically sent to the following:

Rebecca Klymkowsky
Rachel Bender
Assistant County Attorneys
100 Jefferson County Parkway, Ste. 5500
Golden, Colorado 80419
T: 303-271-8932
F: 303-271-8901
rklymkow@jeffco.us
rbender@jeffco.us
*Attorneys for Shrader, Gonzalez, Johnson, Bennett, & Taborsky*

Craig A. Sargent
David Allen Belsheim
April Christine Connally
Hall & Evans, LLC
1001 Seventeenth Street, Ste. 300
Denver, CO 80202
T: 303-628-3300
sargentc@hallevans.com
belsheimd@hallevans.com
connallya@hallevans.com

*Attorney for Defendants Messer, Salazar, Mancha, and Wellpath, LLC*

*s/   Rachel B. Maxam*_____