**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-00827-NYW

ESTATE OF JOHN KOWALSKI, by and through its P.R. DENISE KOWALSKI,

      Plaintiff,

v.

SHERIFF JEFF SHRADER,
MARIO GONZALEZ,
GREG BENNETT,
SCOTT TABORSKY,
CHRISTINA MESSER,
DESIUREE SALAZAR,
BRIANDA MANCHA, and
WELLPATH, LLC,

      Defendants.

---

## ORDER ON MOTION TO DISMISS

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on the Sheriff Defendants' Motion to Dismiss (the "Motion" or "Motion to Dismiss") filed on June 1, 2021 by Defendants Sheriff Jeff Shrader, Deputy Sheriff Greg Bennett, former Deputy Sheriff Mario Gonzales, and retired Sheriff's Sergeant Scott Taborsky (collectively, the "Sheriff Defendants").[1] [Doc. 12]. The court considers the Motion pursuant to 28 U.S.C. § 636(c) and the Order of Reference for all purposes dated June 11, 2021. [Doc. 20]. Upon consideration of the Motion and the related briefing, the court

---

[1] Deputy Sheriff Chaun Johnson, a former defendant in this case, also joined in the Motion to Dismiss. [Doc. 12 at 1]. On December 1, 2021, Plaintiff filed a self-effectuating Notice of Voluntary Dismissal of Defendant Chaun Johnson, and Deputy Johnson, who had not yet filed an answer or a motion for summary judgment, was terminated as a defendant in this matter pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). *See Lundahl v. Halabi*, 600 F. App'x 596, 603 (10th Cir. 2014) (unpublished) (explaining that the filing of a motion to dismiss does not preclude voluntary self-effectuating dismissal under Rule 41(a)(1)(A)(i)).

concludes that oral argument will not materially assist in the resolution of this matter.  Being fully advised in the premises, the Motion to Dismiss is hereby **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

The court takes the following facts from the Complaint and Jury Demand (the "Complaint") [Doc. 1] and presumes they are true for purposes of the instant Motion to Dismiss. John Kowalski ("Mr. Kowalski") was arrested on March 18, 2019 and was booked into the Jefferson County Detention Facility ("JCDF").  [Doc. 1 at ¶ 21].  At the time of his arrest, Mr. Kowalski suffered from substance abuse disorder and an opiate addiction.  [*Id.* at ¶ 22].  On March 20, 2019, at approximately 7:00 a.m., Mr. Kowalski passed out in the shower, fell, and had a seizure.  [*Id.* at ¶ 28].  Medical personnel responded and evaluated Mr. Kowalski.  [*Id.* at ¶ 29]. Mr. Kowalski  was experiencing acute opioid withdrawal and was vomiting, nauseated, dizzy, anxious, agitated, sweating, and restless, and was experiencing headaches, diarrhea, severe muscle cramps, tremors, and abdominal cramping.  [*Id.* at ¶¶ 31-32].

JCDF policy requires that inmates suffering from opiate withdrawal be noted in the system, be given Gatorade to help correct dehydration, and be monitored three times per day.  [*Id.* at ¶¶ 35, 38].  Jail deputies are informed when an inmate is being monitored for opioid withdrawal so they are aware that the inmate "is seriously ill and may have emergent life-threatening medical needs." [*Id.* at ¶ 49].  Around the time that Mr. Kowalski was placed on withdrawal monitoring, "Deputy #2007"[2] entered a note in the file that Mr. Kowalski had passed out or had a seizure in the shower so that other deputies would be aware of Mr. Kowalski's medical needs.  [*Id.* at ¶ 50]

---

[2] The Complaint does not identify Deputy #2007.  *See generally* [Doc. 1].

Due to being monitored for withdrawal symptoms, Mr. Kowalski was placed in a unit "designed for monitoring inmates with medical needs"—module 6B—and was housed with cellmate John Ignacio Barajas ("Mr. Barajas"). [*Id.* at ¶ 51]. Sheriff Deputy Mario Gonzalez ("Deputy Gonzalez" or "Defendant Gonzalez"), Chaun Johnson ("Deputy Johnson"), and Greg Bennett ("Deputy Bennett" or "Defendant Bennett") were on duty in module 6B on March 20, 2019 and were being supervised by Sergeant Scott Taborsky ("Sergeant Taborsky" or "Defendant Taborsky"). [*Id.* at ¶ 54]. At JCDF, deputies and supervisors are assigned to and responsible for inmates in specific housing units during their shifts and are to monitor the inmates in those units from workstations located in each housing unit. [*Id.* at ¶ 58]. Mr. Kowalski's cell was located directly in front of and approximately 40 feet away from the workstation in his unit, with no walls in between the two to obstruct sound. [*Id.* at ¶ 65]. JCDF cells are equipped with emergency call buttons which activate an alert with a flashing light and/or noise at the unit workstation to alert staff of an emergency in the housing unit. [*Id.* at ¶ 59].

At JCDF, inmates are locked in their cells for the night at approximately 10:00 p.m. [*Id.* at ¶ 52]. At approximately 11:03 p.m., Mr. Barajas heard Mr. Kowalski "making strange, raspy, choking, and gurgling breathing sounds." [*Id.* at ¶ 56]. Mr. Kowalski was struggling to breathe and was not responding to Mr. Barajas's verbal questions or physical attempts to shake or tap him. [*Id.* at ¶¶ 56-57]. Mr. Barajas repeatedly pressed the cell's emergency call button to summon assistance for Mr. Kowalski. [*Id.* at ¶ 61]. No one responded to the emergency call. [*Id.*]. After approximately ten minutes, Mr. Barajas pushed the emergency call button again. [*Id.*]. He also "repeatedly pounded hard on the cell door and yelled 'hey, hey' and 'help' trying to get the attention of deputies" to assist Mr. Kowalski. [*Id.* at ¶ 62]. While Mr. Barajas was attempting to summon help for Mr. Kowalski, Defendants Gonzalez, Bennett, and Taborsky were "visibly

standing at the nearby workstation conducting ordinary, non-emergent business;" for example, Defendant Gonzalez was briefing Defendant Taborsky about an inmate altercation that had occurred earlier in the day. [*Id.* at ¶ 63]. Each of Defendants Gonzalez, Bennett, and Taborsky saw or heard the emergency call button continually alarming. [*Id.* at ¶ 64]. Moreover, Defendants Gonzalez and Bennett were close enough to Mr. Kowalski's cell to hear Mr. Barajas yelling and pounding on the cell door, which was "thin enough that deputies can converse with inmates through the door and at a normal speaking volume," and to see Mr. Barajas's face in the cell window. [*Id.* at ¶ 65]. Despite the fact that Defendants Gonzalez, Bennett, and Taborsky were on notice that Mr. Kowalski was experiencing opiate withdrawal, had passed out and had a seizure earlier in the day, and had observed that Mr. Kowalski was seriously ill throughout the day and did not get out of bed for the 10:00 p.m. headcount, [*id.* at ¶¶ 66-67], they "ignored the emergency call button alert for at least" 15 to 20 minutes. [*Id.* at ¶ 70]. At the time of the events giving rise to this case, JCDF had no written policies regarding a deputy's responsibilities or obligations when an inmate presses the emergency call button. [*Id.* at ¶ 83].

Defendant Gonzalez then began a walkthrough of the unit; when he was near Mr. Kowalski's cell, Mr. Barajas flagged Deputy Gonzalez's attention and informed him that Mr. Kowalski was nonresponsive. [*Id.* at ¶ 73]. When Defendant Gonzalez entered the cell, Mr. Kowalski had no pulse and his face was purple from a lack of oxygen. [*Id.* at ¶ 75]. Deputy Johnson immediately arrived at the cell and he and Defendant Gonzalez began performing CPR on Mr. Kowalski. [*Id.* at ¶ 76]. Defendant Bennett and non-Party Barry LeCavalier then arrived at Mr. Kowalski's cell. [*Id.* at ¶ 77]. But by the time these individuals arrived at the cell, Mr. Kowalski had been in cardiac arrest—and had not had a heartbeat or received oxygen to his brain— for approximately 15 minutes. [*Id.* at ¶ 78]. JCDF staff and medical personnel performed CPR

and defibrillated Mr. Kowalski for approximately 10 to 15 minutes before they were able to obtain a heartbeat.  [*Id.* at ¶ 80].  Mr. Kowalski was taken to the hospital, where he was pronounced brain dead due to a sustained lack of oxygen to his brain.  [*Id.* at ¶ 81].  Mr. Kowalski died on March 28, 2019.  [*Id.* at ¶ 82].

Plaintiff, the Estate of John Kowalski ("Plaintiff" or the "Estate"), initiated this civil action on March 20, 2021 against Defendants Gonzalez, Bennett, Taborsky, and Sheriff Jeff Shrader ("Sheriff Shrader" or "Defendant Shrader"), as well as Medical Defendants Christina Messer, Desiree Salazar, Brianda Mancha, and Wellpath, LLC.[3]  *See generally* [*id.*].  Plaintiff raises the following Claims: (1) a 42 U.S.C. § 1983 deliberate indifference claim[4] against Defendants Gonzalez, Bennett, and Taborsky[5] ("Claim One"); (2) a § 1983 deliberate indifference claim against Defendant Taborsky alleging a failure to supervise ("Claim Two"); (3) a § 1983 deliberate indifference claim alleging municipal liability against Sheriff Jeff Shrader ("Defendant Shrader" or "Sheriff Shrader"), the Sheriff of Jefferson County, Colorado, in his official capacity ("Claim Three"); and (4) a common law negligence claim against the Medical Defendants ("Claim Four").  *See* [*id.* at 17-21].

On June 1, 2021, the Sheriff Defendants filed the instant Motion to Dismiss, seeking to dismiss Plaintiff's Claims One, Two, and Three for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  [Doc. 12].[6]  Specifically, the Sheriff Defendants argue that (1) Defendants Gonzalez, Bennett, and Taborsky are entitled to qualified immunity against

---

[3] Wellpath, LLC "employs medical professionals and contracts with Colorado facilities for the provision of medical services to inmates including JCDF."  [Doc. 1 at ¶ 16].

[4] *See infra* Section I.A.

[5] *See infra* Section I.B.

[6] The Medical Defendants filed an Answer on June 11, 2021.  [Doc. 19].

Plaintiff's Claims; and (2) Plaintiff has failed to state a deliberate indifference claim against Defendant Shrader in his official capacity.  [*Id.* at 7-15].   Plaintiff responded to the Motion to Dismiss on June 22, 2021, [Doc. 26], and the Sheriff Defendants have since replied.  [Doc. 35].  The Motion is thus ripe for consideration and the court considers the Parties' arguments below.

## LEGAL STANDARDS

### I.    Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).   Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible").   The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

II.     **Qualified Immunity**

The doctrine of qualified immunity protects government officials from individual liability for actions carried out while performing their official duties so long as their conduct does not violate clearly established constitutional or statutory rights. *Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1197 (10th Cir. 2017). To facilitate the efficient administration of public services, the doctrine functions to protect government officials performing discretionary actions and acts as a "shield from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once a defendant has asserted a defense of qualified immunity, the burden shifts to the plaintiff who must establish that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the defendant's action. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015).

A right is clearly established if there is a Supreme Court or Tenth Circuit decision on point or if the weight of authority in other courts provides that the right is clearly established. *Washington*, 847 F.3d at 1197 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted)); *DeSpain v. Uphoff*, 264 F.3d 965, 979 (10th Cir. 2001). Plaintiff's Complaint need not contain all the necessary factual allegations to sustain a conclusion that Defendants violated clearly established law. *See Robbins*, 519 F.3d at 1249 (recognizing that a heightened pleading standard is not required). The Complaint must satisfy only the minimum pleading requirements articulated in *Twombly* and discussed above. *Id.*

## ANALYSIS

The Sheriff Defendants seek dismissal of Plaintiff's Claims One and Two on qualified-immunity grounds, [Doc. 12 at 7], and further argue that the Estate has failed to state a claim

against Defendant Shrader in his official capacity under Rule 12(b)(6). [*Id.* at 15]. Before turning to the Parties' substantive arguments as to the propriety of dismissal, the court must first resolve two preliminary issues: first, the constitutional basis of Plaintiff's claims, and second, which of Plaintiff's claims are asserted against which Defendant(s).

## I.      The Scope and Nature of Plaintiff's Claims

### A.      The Constitutional Basis of Plaintiff's Claims

In the Complaint, the Estate frames Claims One, Two, and Three as arising under the Fourteenth Amendment. [Doc. 1 at 19]. But in their Motion to Dismiss, the Sheriff Defendants request that the court take judicial notice of a mittimus issued by the Jefferson County District Court which reflects that Mr. Kowalski admitted to a probation violation before he was placed at JCDF. *See* [Doc. 12 at 2 n.3; Doc. 12-1]. The Sheriff Defendants assert that, because Mr. Kowalski was incarcerated as a convicted inmate at the time of his death, the Eighth Amendment, rather than the Fourteenth Amendment, governs the Estate's claims; further, they argue that dismissal is warranted for failure to bring the claims under the correct constitutional amendment. [Doc. 12 at 2 n.3, 5]. In its Response, Plaintiff represents that the records available at the time the Complaint was filed suggested only that Mr. Kowalski was detained as pretrial detainee but now concedes that, based on the mittimus, its constitutional claims should arise under the Eighth Amendment. [Doc. 26 at 3]. Further, Plaintiff acknowledges that the proper way to amend a claim would be to file an amended complaint, *see* [*id.* at 4 n.1], but notes the similar legal analysis required for either an Eighth or Fourteenth Amendment deliberate-indifference claim and states that it has "conferred with the Defendants and obtained agreement that the Court may consider the claim to have been raised and/or considered to be amended to be raised under the Eighth Amendment." [*Id.* at 3-4]. Thus, in order to avoid necessary delay, Plaintiff "ask[s] that the merits

of the [Motion to Dismiss] be considered now, and if an amended complaint must be filed Plaintiff will do so after resolution."  [*Id.* at 4 n.1].

The Tenth Circuit has sometimes excused "a plaintiff's reliance on the incorrect amendment as an inconsequential mistake when the error appears to be the product of inadvertence and where the distinction would be immaterial to the analysis."  *Doe v. Univ. of Denver*, 952 F.3d 1182, 1187 n.2 (10th Cir. 2020) (citing cases).  Moreover, the United States Supreme Court has advised that the federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014); *see also* 5 Wright & Miller, Federal Practice and Procedure § 1219 (4th ed.) ("[I]t is clear that the federal rules—and the decisions construing them—evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits.").

As both Parties acknowledge, *see* [Doc. 12 at 2 n.3; Doc. 26 at 3], the Tenth Circuit evaluates a Fourteenth Amendment deliberate-indifference claim using "an analysis identical to that applied in Eighth Amendment cases."  *Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019); *see also Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020).  Thus, the court's analysis in reviewing the Motion to Dismiss would be identical whether Plaintiff's claims are construed under the Eighth or Fourteenth Amendment.  *Cf. Kellum v. Bernalillo Cty.*, 250 F. Supp. 3d 846, 850 (D.N.M. 2017) (on summary judgment, finding that the classification between whether Plaintiff was a pretrial detainee or inmate was "largely a technical exercise" because regardless of the plaintiff's status, the court would apply the same analysis under the Eighth and Fourteenth Amendments).  And district courts faced with similar circumstances have elected to analyze the

claim under the correct constitutional amendment in light of the identical standards for deliberate indifference claims. *See, e.g., Lopez-Aguirre v. Bd. of Cty. Comm'rs of Shawnee Cty.*, No. 12-2752-JWL, 2013 WL 1668239, at *2 (D. Kan. Apr. 17, 2013) (although the plaintiff's Eighth Amendment claim was "subject to dismissal as pleaded" because it should have been brought under the Fourteenth Amendment, recognizing that the plaintiff could amend her complaint and electing to analyze the sufficiency of the deliberate indifference claim under the Fourteenth Amendment); *Bozeman v. Cty. of Elmore*, No. 2:20-cv-640-ECM, 2021 WL 2954004, at *3 (M.D. Ala. July 14, 2021) ("Because both Eighth and Fourteenth Amendment claims are governed by the same deliberate indifference standard, . . . the Court can proceed with its analysis of the motions to dismiss, but the Court will give the Plaintiff an opportunity to file an amended complaint . . . and to plead his constitutional claim under the appropriate constitutional provision, to the extent such amendment would not be futile.").

Because (1) the Parties agree that the applicable legal analysis is the same under both the Eighth and Fourteenth Amendments; (2) Defendants will not be prejudiced by analyzing Plaintiff's claims under the Eighth Amendment, given that they have already raised arguments under the relevant standards in their Motion to Dismiss; (3) although Plaintiff is represented, it appears the reliance on the wrong constitutional standard was due to inadvertence rather than gamesmanship or a strategic decision, *see* [Doc. 26 at 3]; and (4) the interests of judicial economy favor a ruling on the pending Motion rather than requiring the Parties to re-brief the same arguments based on a technical error, the court will consider the merits of the Motion to Dismiss under the applicable deliberate-indifference standards. *See Doe*, 952 F.3d at 1187 n.2; Fed. R. Civ. P. 1.

B.      **Against Whom Each Claim is Asserted**

Next, the court must ascertain which of Plaintiff's claims are asserted against which Defendants.  Plaintiff asserts Claim One against the "Jail Defendants," whom Plaintiff originally defines in the Complaint as Defendants Gonzalez, Johnson, and Bennett.  [Doc. 1 at ¶ 54].  But in Claim One, Plaintiff states the following: "detention officers Sergeant Taborsky and Deputies Gonzalez, Johnson, and Bennett (the Jail Defendants) at JCDF were responsible for Kowalski's detention and care."  [*Id.* at ¶ 98].  It is thus unclear whether "Jail Defendants" includes Defendant Taborsky.  Noting this uncertainty, the Sheriff Defendants state in their Motion to Dismiss that "[g]iven that the Estate identifies Claim Two as a separate deliberate indifference claim against Sgt. Taborsky in his individual capacity and that including Sgt. Taborsky in Claim One would therefore be duplicative, the Sheriff Defendants construe Claim One as against the Deputies only." [Doc. 12 at 4 n.4].  The Sheriff Defendants do not cite legal authority in support of their argument. [*Id.*].

Plaintiff does not respond to the Sheriff Defendants' argument that Claims One and Two are duplicative as to Defendant Taborsky and does not clarify against whom each Claim is raised. *See* [Doc. 26].  Plaintiff does state that the "Jail Defendants" are "referred to as the 'Sheriff Defendants' in the Motion to Dismiss," which would suggest that "Jail Defendants" includes Defendant Taborsky.  [*Id.* at 2]; *see also* [Doc. 12 at 1 (including Defendant Taborsky in the definition of "Sheriff Defendants")].  And in arguing that the claims against the Jail Defendants should remain, Plaintiff raises arguments concerning "Defendants Johnson, Bennett, and Taborsky."  [Doc. 26 at 9].  Finally, Plaintiff references the "claims" against Defendant Taborsky and further argues that it "states a plausible claim for relief against Defendant Taborsky in both an individual and supervisory capacity."  [*Id.* at 15, 16].

A plaintiff cannot amend the complaint via a response to a motion to dismiss, *Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015), and Plaintiff is represented by counsel and is not entitled to a liberal construction of its filings. *Ward v. Express Messenger Sys., Inc.*, No. 17-cv-02005-NYW, 2020 WL 6828105, at *2 n.4 (D. Colo. July 21, 2020). Thus, to the extent Plaintiff attempts to clarify in its Response that Claim One is raised against Defendant Taborsky in addition to Defendants Gonzalez and Bennett, the court is disinclined to construe the Complaint based on statements made in the Response. However, Plaintiff does, in the Complaint, appear to define "Jail Defendants" as including Defendant Taborsky, [Doc. 1 at ¶ 98], and the court is required to construe the Complaint in Plaintiff's favor. *Gray v. Little*, No. 18-cv-02644-RBJ-KMT, 2020 WL 703048, at *3 (D. Colo. Feb. 12, 2020). Moreover, Defendants do not cite legal authority demonstrating that (1) a person cannot simultaneously be sued based both on personal participation and supervisory liability; or (2) duplicative claims must be dismissed at the motion-to-dismiss stage. *See* [Doc. 12; Doc. 35]; *see also Harbeck v. Smith*, 814 F. Supp. 2d 608, 626-27 (E.D. Va. 2011) ("[S]upervisors can be held liable in their individual capacities only for their personal wrongdoing or supervisory actions that violated constitutional norms.") (quotation omitted); *cf. Saunders as next friend of R.S. v. USD 353 Wellington*, No. 19-2538-DDC-TJJ, 2021 WL 1210019, at *14-15 (D. Kan. Mar. 31, 2021) (declining to dismiss supervisory liability claim as "duplicative" because the defendants had failed to cite legal authority supporting dismissal on this basis and because the Federal Rules "permit litigants to plead alternative theories of recovery."). The court will thus construe Claim One as asserted against Defendants Gonzalez, Bennett, and Taborsky; Claim Two as against Defendant Taborsky; and Claim Three against Defendant Shrader.[7]

---

[7] However, Plaintiff is hereby advised that, should this case proceed to trial, Plaintiff may be ordered to show cause why Claims One and Two are not duplicative as to Defendant Taborsky.

## II.	Eighth Amendment Deliberate Indifference

The Eighth Amendment protects against the government's infliction of cruel and unusual punishment.  U.S. Const. amend. VIII.  "A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment."  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005); *see also Garcia v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985) ("Failure to provide adequate medical care is a violation of the Eighth Amendment if it is a result of deliberate indifference to a prisoner's serious medical needs.").  To establish a prison official's constitutional liability based on that official's deliberate indifference, a plaintiff must satisfy both objective and subjective components of the deliberate-indifference test.  *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  The objective component requires Plaintiff to allege objective facts that demonstrate that the constitutional deprivation was "sufficiently serious."  *Mata*, 427 F.3d at 751 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  The subjective component requires Plaintiff to sufficiently allege Defendants' culpable state of mind, i.e., to establish that the Sheriff Defendants knew Mr. Kowalski faced a substantial risk of harm, yet disregarded that risk.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quotations and citation omitted).

Deliberate indifference requires more than mere negligence.  *Sealock*, 218 F.3d at 1211; *Est. of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016) (comparing the subjective component to recklessness in criminal law, where, to act recklessly, a person must "consciously disregard a substantial risk of serious harm.").  Whether a defendant had the requisite knowledge of a substantial risk of serious harm may be inferred from circumstantial evidence, which may be

satisfied upon a showing that the serious medical need was "obvious."  *See DeSpain*, 264 F.3d at 975 (quotations and citations omitted).

Plaintiff claims that Defendants Gonzalez, Bennett, and Taborsky were unconstitutionally deliberately indifferent to Mr. Kowalski's serious medical needs which constituted a violation of his Eighth Amendment rights.  *See, e.g.*, [Doc. 12 at ¶¶ 106, 110].  The Sheriff Defendants argue that the Estate has failed to allege that these Defendants were deliberately indifferent to Mr. Kowalski's serious medical needs because the Estate has not alleged (1) the existence of a sufficiently serious medical need, so as to satisfy the objective prong; or (2) that these Defendants knew of a serious risk to Mr. Kowalski's health and yet disregarded that risk, so as to establish the subjective prong.  [Doc. 12 at 7-11].  In the alternative, they argue that even if Defendants Gonzalez, Bennett, and Taborsky recklessly disregarded an objectively serious medical need, Plaintiff cannot show that the constitutional right at issue was clearly established at the time of the events in question.  [*Id.* at 12-13].  On both of these bases, Defendants Gonzalez, Bennett, and Taborsky assert that they are entitled to qualified immunity.  [*Id.*].

In response, Plaintiff asserts that Mr. Kowalski's severe withdrawal symptoms, delay in receiving medical care, and ultimate death are sufficient to establish an objectively serious medical need.  [Doc. 26 at 6-7].  Moreover, it argues that it has sufficiently alleged the Sheriff Defendants' subjective indifference to that medical need because these Defendants knew that Mr. Kowalski was in withdrawal and yet ignored Mr. Barajas's emergency calls for help.  [*Id.* at 8-11].  Finally, they argue that the Sheriff Defendants impermissibly narrow the constitutional right in question and that the right at issue was clearly established, or in the alternative, qualified immunity should not apply because the unlawfulness of Defendants' conduct was clear.  [*Id.* at 13-14].  The court addresses the Parties' arguments in turn.

A.      **The Violation of a Constitutional Right**

Because Defendants Gonzales, Bennett, and Taborsky raise a defense of qualified immunity, Plaintiff must show that (1) these Defendants violated a constitutional right; and (2) the right was clearly established at the time of the violation.   *Puller*, 781 F.3d at 1196.   As set forth above, to sufficiently allege a violation of Mr. Kowalski's Eighth Amendment rights, the Estate must allege both an objective component—that the medical need was sufficiently serious—and a subjective component—that Defendants knew that Mr. Kowalski faced a substantial risk of harm, and yet disregarded that risk.   *Mata*, 427 F.3d at 751; *Estelle*, 429 U.S. at 106.

1.      **The Objective Component**

First, the Sheriff Defendants argue that Plaintiff has failed to allege that Mr. Kowalski suffered from a sufficiently objectively serious medical need.   [Doc. 12 at 8].   A medical need is "sufficiently serious" if it "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."   *Sealock*, 218 F.3d at 1209.   Moreover, "[a] delay in medical treatment constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm."   *Vigil v. Laurence*, 524 F. Supp. 3d 1120, 1128 (D. Colo. 2021).   This substantial harm requirement may be met by a showing of a "lifelong handicap, permanent loss, or considerable pain."   *McCowan v. Morales*, 945 F.3d 1276, 1291 (10th Cir. 2019) (internal quotation marks omitted).

"[I]t is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely 'the symptoms presented at the time the prison employee has contact with the prisoner.'"   *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Mata*, 427 F.3d at 753).   But courts have found that allegations of a sufficiently serious medical

need may be based on either allegations of intermediate symptoms or allegations of an ultimate attendant harm. *Mata*, 427 F.3d at 753. For example, in *Mata*, the Tenth Circuit concluded that the plaintiff's severe chest pain, as well as her ultimate heart attack, were each sufficiently serious to satisfy the objective prong. *Id.* And in *Paugh v. Uintah Cty.*, No. 2:17-cv-01249-JNP-CMR, 2020 WL 4597062 (D. Utah Aug. 11, 2020), the court concluded that a prisoner's intermediate symptoms of alcohol withdrawal—tremors, paleness, vomiting, chills, fever, and shaking—were sufficiently serious to meet objective prong, as was the prisoner's ultimate death, which was the result of a delay in treating his symptoms. *Id.* at *24.

Here, the ultimate harm claimed by Plaintiff is Mr. Kowalski's death, *see, e.g.*, [Doc. 1 at ¶¶ 101, 106, 114], and the Complaint alleges the Defendants' delay in medical attention was the proximate cause of Mr. Kowalski's death. [*Id.* at ¶¶ 101-02, 106, 112, 114]. The Tenth Circuit has repeatedly recognized that "death, is, without doubt, sufficiently serious to meet the objective component." *Burke*, 935 F.3d at 992 (quotation and alteration marks omitted); *Martinez*, 563 F.3d at 1088; *Cox v. Glanz*, 800 F.3d 1231, 1240 n.3 (10th Cir. 2015). The court thus finds that Plaintiff has sufficiently alleged the existence of an objectively serious harm so as to satisfy the objective component of the deliberate-indifference test.[8]

---

[8] In arguing that Mr. Kowalski's medical need was not sufficiently objectively serious, Defendants rely on *Quintana v. Santa Fe County Board of Commissioners*, in which the Tenth Circuit stated that, as of 2020, "[n]o No Tenth Circuit authorities ha[d] concluded that heroin withdrawal presents a 'sufficiently serious' medical need." 973 F.3d 1022, 1029 (10th Cir. 2020). But the question before the court is not whether Mr. Kowalski's exact diagnosis has been affirmatively recognized by the Tenth Circuit as a sufficiently serious medical need, but whether Mr. Kowalski's medical need was, in fact, sufficiently serious; Tenth Circuit precedent makes clear that death is indeed sufficiently serious. *Burke*, 935 F.3d at 992.

2.       **The Subjective Component**

Next, the court must determine whether the Complaint sufficiently alleges that Defendants Gonzalez, Bennett, or Taborsky knew of a substantial risk of harm to Mr. Kowalski and disregarded that risk.  The Sheriff Defendants argue that it does not.  [Doc. 12 at 8].  Specifically, they assert that "the Complaint's reliance on generalized allegations about the Jail's protocols regarding withdrawal and other medical conditions . . . fails to establish that [Defendants Gonzalez, Bennett, or Taborsky] had specific knowledge that would have put them on notice that Kowalski was at particular risk of harm as a result of withdrawing from opioids."  [*Id.* at 10].  In addition, the Sheriff Defendants assert that, because the Complaint alleges that these Defendants knew that Mr. Kowalski was subject to opioid withdrawal protocols and was being actively monitored by jail staff, "[t]hese allegations temper the degree to which [they] can be deemed to have been deliberately indifferent."  [*Id.* at 11].  Plaintiff counters that Defendants Gonzalez, Bennett, and Taborsky disregarded a serious risk because they knew that Mr. Kowalski was experiencing opiate withdrawal, had passed out and had had a seizure earlier in the day, and looked severely ill, and yet they ignored Mr. Barajas's emergency call button alerts and his yells for help.  [Doc. 26 at 8].

The subjective component requires that a plaintiff raise allegations sufficient to show that "officials acted with a 'sufficiently culpable state of mind.'"  *Vega v. Davis*, 673 F. App'x 885, 890 (10th Cir. 2016) (unpublished) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "[A] prison official cannot be liable 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837)).  "The deliberate indifference standard lies 'somewhere between the poles of negligence at one end and purpose or

knowledge at the other.'"  *Mata*, 427 F.3d at 752 (quoting *Farmer*, 511 U.S. at 836).  "[O]n one end of the spectrum, 'deliberate indifference does not require a finding of express intent to harm,' . . . and on the other, 'an inadvertent failure to provide adequate medical care does not rise to a constitutional violation.'"  *Paugh*, 2020 WL 4597062, at *25 (quoting *Mata*, 427 F.3d at 752 and *Est. of Booker v. Gomez*, 745 F.3d 405, 430 (10th Cir. 2014)); *see also Est. of Yoemans by & through Ishmael v. Campbell*, 501 F. Supp. 3d 1034, 1049-50 (D. Colo. 2020) ("While plaintiffs bear the burden of establishing that prison officials had a sufficiently culpable state of mind, there is no requirement that defendants have the 'express intent to harm'" the decedent.).  Moreover, a plaintiff need not establish that the prison official "acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm."  *Farmer*, 511 U.S. at 842.

> ***Knowledge of a Substantial Risk of Harm***.  First, the court must decide whether the Complaint sufficiently alleges that Defendants Gonzalez, Bennett, and Taborsky knew of the risk of harm to Mr. Kowalski.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact," *id.*, and "[t]he factfinder may conclude that a prison official subjectively knew of the substantial risk of harm by circumstantial evidence or 'from the very fact that the risk was obvious.'"  *Martinez*, 563 F.3d at 1089 (quoting *Farmer*, 511 U.S. at 842).  "[I]f a risk is so obvious that a reasonable man might realize it, [the court] might well infer that the defendant did in fact realize it."  *Mata*, 427 F.2d at 752 (alteration marks changed).  Moreover, "the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference," *Martinez*, 563 F.3d at 1089, and when a deliberate indifference claim is based on an alleged delay in medical care, the relevant question is whether the symptoms were "such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it."  *Mata*, 427 F.3d at 753.

The Sheriff Defendants argue that the Complaint's generalized allegations are insufficient to establish Defendant Gonzalez's, Defendant Bennett's, and Defendant Taborsky's knowledge. [Doc. 12 at 9]. The court respectfully disagrees. The Complaint alleges these Defendants knew that Mr. Kowalski was in opiate withdrawal and had been flagged for withdrawal monitoring; knew that Mr. Kowalski had passed out and had had a seizure earlier in the day; had observed that Mr. Kowalski "was seriously ill throughout the day, . . . and did not get out of bed for a headcount on or about 10:00 p.m. in the course of doing their walkthroughs to monitor inmates," [Doc. 1 at ¶¶ 66-68]; was not drinking Gatorade or eating; and "was vomiting, lying on bed, and looked severely unwell." [*Id.* at ¶ 55].[9] The Complaint also alleges that it is "well known, particularly in jails and correctional facilities, that opiate withdrawal often causes severe dehydration, vomiting, and diarrhea, which can lead to death." [*Id.* at ¶ 25]. Further, Plaintiff alleges that, when Mr. Kowalski was unresponsive, Mr. Barajas pushed the emergency call button in their shared cell— which was in a unit "designed for monitoring inmates with medical needs," [*id.* at ¶ 51]—multiple times, and that each of these Defendants were close to Mr. Kowalski's cell during the medical emergency and saw or heard "the emergency call button continually alarming that a medical emergency was occurring" in Mr. Kowalski's cell. [*Id.* at ¶¶ 61, 63-64]. Finally, the Complaint

---

[9] The exact Paragraph reads: "It would have been apparent to everyone who saw or heard about Kowalski on March 20, 2019, including the named Defendants, that he was severely ill because he was not drinking Gatorade or food [sic] provided to him, he had fallen and seized in the shower, and he was vomiting, lying in bed, and looked severely unwell, in a detention cell designed for persons suffering from medical conditions." [Doc. 1 at ¶ 55]. The court finds this phrasing unclear, as it does not clearly indicate whether Defendants—namely, the Sheriff Defendants— actually saw or "heard about" Mr. Kowalski, or whether, *if* these Defendants *had* seen or heard about Mr. Kowalski, his illness would have been obvious to Defendants. Although Plaintiff is represented, the court does not find it appropriate to base a dismissal decision on a potentially mis-worded or unclearly phrased allegation. Construing this allegation in Plaintiff's favor, the court construes this allegation as asserting that the Sheriff Defendants each either saw or heard about Mr. Kowalski and that the Sheriff Defendants thus knew that Mr. Kowalski was experiencing the above symptoms.

states that the Defendants Gonzalez and Bennett were "close enough to hear" Mr. Barajas yelling and pounding on his cell door and could see his face at the cell window.  [*Id.* at ¶ 65].

The court finds these allegations, taken together, sufficient to allege that Defendants Gonzalez, Bennett, and Taborsky knew of a serious risk of harm to Mr. Kowalski at the time Mr. Barajas was pressing the emergency call button.  There are several contextual layers to these Defendants' knowledge, and each is relevant to the court's conclusion.  First, Plaintiff alleges that Defendants Gonzalez, Bennett, and Taborsky knew that Mr. Kowalski was experiencing an opiate withdrawal and had been flagged for opiate monitoring.  *Compare Est. of Martinez*, 176 F. Supp. 3d at 1228 (finding that the plaintiffs had failed to state a deliberate indifference claim where they failed to allege that the defendant knew that the decedent was suffering from withdrawal).[10] Second, Plaintiff alleges that these Defendants knew that Mr. Kowalski had either fallen or passed out and had had a seizure earlier in the day.  *Cf. Peet v. Beard*, No. 3:10-cv-482, 2015 WL 2250233, at *11 (M.D. Pa. May 12, 2015) (in denying summary judgment, considering the fact that a medical emergency "followed closely on the heels of an earlier seizure" in determining that a jury could find that the defendants subjectively disregarded a risk); *Est. of Perry v. Wenzel*, 872 F.3d 439, 456 (7th Cir. 2017) (reversing summary judgment based *inter alia* on the defendant's knowledge that the decedent had been to the hospital earlier in the day due to a seizure, from which a jury could infer that the defendant "was on notice that [the decedent] had a serious medical need").

---

[10] The court acknowledges the Tenth Circuit's observation that "[n]o Tenth Circuit authorities have concluded that heroin withdrawal [alone] presents a 'sufficiently serious' medical need," *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1029 (10th Cir. 2020), and that knowledge of a withdrawal "[b]y itself" may not constitute knowledge of a serious risk of harm.  *See Speers v. Cty. of Berrien*, 196 F. App'x 390, 396 (6th Cir. 2006) (unpublished).  But the court finds Defendants' knowledge of Mr. Kowalski's withdrawal relevant in the context of, and when considered with, Defendants' knowledge of all of the circumstances surrounding Mr. Kowalski's alleged substantial risk of harm.

Third, the Complaint also asserts that these Defendants knew that Mr. Kowalski was vomiting, not eating or drinking, was lying in bed, did not get out of bed for the headcount, and looked "severely unwell."  The Tenth Circuit has suggested that allegations of vomiting plus some other component may sufficiently allege an obvious risk of harm.  In *Estate of Jensen by Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021), the Tenth Circuit rejected the defendant's argument that "frequent vomiting alone does not present an obvious risk" of harm because, in addition to vomiting, the decedent (1) had opiates in her system; (2) "looked sick and was 'walking like a skeleton;'" (3) had diarrhea; (4) had been vomiting for four straight days; and (5) could not keep down food or water.  *Id.* at 859.  According to the Tenth Circuit, these circumstances "present[ed] a risk of harm that would be obvious to a reasonable person."  *Id.*; *see also Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1030 (10th Cir. 2020) (finding that, while "frequent vomiting alone does not present an obvious risk of severe and dangerous withdrawal," vomiting blood does present an obvious risk); *Lovato v. Nira*, No. 17-cv-01041-NYW, 2020 WL 705232, at *4 (D. Colo. Feb. 12, 2020) (allegations of dry heaving, abdominal pain, and vomiting presented an objectively serious medical condition).  Thus, the Complaint alleges symptoms that are "so obvious that even a lay person would easily recognize" the potential need for medical attention. *Sealock*, 218 F.3d at 1209.

And finally, fourth, Plaintiff alleges that, armed with the above knowledge of Mr. Kowalski's health condition and symptoms, Defendants Gonzalez, Bennett, and Taborsky knew that Mr. Barajas had activated the emergency call button in Mr. Kowalski's cell, "a clear indication that an emergency was at hand," *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005), and that Defendants Gonzalez and Bennett could hear Mr. Barajas banging on the cell door and yelling for help.  *Cf. Havens v. Clements*, No. 13-cv-00452-MSK-MEH, 2014 WL 1213804, at *17 (D. Colo.

Mar. 24, 2014) (allegations that plaintiff pressed the nurses' call button several times repeatedly and was required to wait several hours for help were sufficient to allege that defendants knew of and disregarded a substantial risk to the plaintiff's health); *Al-Turki v. Robinson*, 762 F.3d 1188, 1194 (10th Cir. 2014) (affirming denial of qualified immunity where the defendants allegedly ignored repeated calls for help from inmate who they knew was experiencing severe abdominal pain).

A plaintiff can state a claim for deliberate indifference by alleging that a prison official denied care "although presented with recognizable symptoms which potentially create a medical emergency." *Al-Turki*, 762 F.3d at 1194. The circumstances alleged in the Complaint, taken together, sufficiently allege that Defendants Gonzalez, Bennett, and Taborsky knew of a substantial risk of harm to Mr. Kowalski. *Cf. Est. of Perry*, 872 F.3d at 456 (considering the defendant's knowledge of the decedent's prior health issues and the defendant's observations of the decedent together in finding that a reasonable jury could conclude that the defendant was on notice of a serious medical need); *Paugh*, 2020 WL 4597062, at *31 (considering defendant's knowledge that decedent was at risk of acute alcohol withdrawal, was highly intoxicated, and had exhibited worsening symptoms throughout defendant's shift in concluding that allegations were sufficiently establish the defendant's knowledge).

***Disregard of the Risk***. In addition to alleging the Sheriff Defendants' knowledge of a substantial risk, Plaintiff must also allege that the Sheriff Defendants recklessly disregarded that risk. *Self*, 439 F.3d at 1231. The reckless-disregard prong of the subjective component may be met by allegations demonstrating that "jail officials confronted with serious symptoms took no action to treat them." *Burke*, 935 F.3d at 993. And where a prison official knows of an inmate's need for medical attention, "[a] prisoner may satisfy the subjective component by showing that

defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [the prisoner's] condition." *Mata*, 427 F.3d at 755. "Even a brief delay may be unconstitutional." *Id.* (finding evidence of a three-minute delay in seeking medical attention was sufficient to preclude summary judgment).

The Sheriff Defendants assert that "there are no allegations to connect the alleged failure of [Defendants Gonzalez, Bennett, or Taborsky] to respond more quickly" to Mr. Barajas's calls for help "with a disregard of substantial risk to Kowalski of harms related to opioid withdrawal." [Doc. 12 at 11]. The Sheriff Defendants assert that, while the failure to respond to the emergency alert may have been negligent, the Complaint fails to establish that the belated response constituted a disregard for a known risk of harm. [*Id.* at 12]. While the Sheriff Defendants generally cite case law as to whether withdrawal symptoms alone indicate a serious risk of harm and general legal statements that a defendant's conduct must be connected to a disregard for a risk of harm, *see* [*id.* at 11-12], Defendants do not cite any authority demonstrating that the Complaint's allegations as to the Sheriff Defendants' delay in responding to Mr. Barajas's calls for help are insufficient to allege a reckless disregard of harm. *See* [*id.*].

In fact, Tenth Circuit law is clear that allegations of a delay in medical treatment in light of a known risk of harm to an inmate are sufficient to allege that a defendant disregarded that substantial risk of harm. *See, e.g., Mata*, 427 F.3d at 755; *Sealock*, 218 F.3d at 1210; *Redmond v. Crowther*, 882 F.3d 927, 940 (10th Cir. 2018) ("The subjective prong is met if prison officials intentionally deny or delay access to medical care or intentionally interfere with the treatment once prescribed."); *Sanders v. Creek Cty. Bd. of Cty. Comm'rs*, No. 17-cv-00492-JHP-FHM, 2018 WL 3580770, at *7 (N.D. Okla. July 25, 2018) ("[The defendant's] alleged delay or failure in

alleviating [the plaintiff's] known deteriorating health conditions states a claim for deliberate indifference.").

Here, Plaintiff alleges that Defendants Gonzalez, Bennett, and Taborsky were near Mr. Kowalski's cell and saw and heard the emergency call button "continually alarming." [Doc. 1 at ¶ 64]. Moreover, Plaintiff asserts that Defendants Gonzalez and Bennett were close enough to hear Mr. Barajas yelling for help and close enough to see Mr. Barajas's face through the cell door. [*Id.* at ¶ 65]. However, according to Plaintiff, Defendants Gonzalez, Bennett, and Taborsky ignored the emergency calls for at least 15 to 20 minutes and failed to respond to Mr. Kowalski's cell. [*Id.* at ¶¶ 70-72]. After being taken to the hospital, Mr. Kowalski was pronounced brain dead "due to the sustained lack of oxygen to his brain during the time it took deputies to respond to the emergency call and [Mr.] Barajas yelling and pounding on the cell door for help." [*Id.* at ¶ 81]. The court finds that these allegations sufficiently allege a delay in medical treatment leading to substantial harm, and thus, these allegations sufficiently allege a conscious disregard for a known serious risk of harm on the parts of Defendants Gonzalez, Bennett, and Taborsky. *McCowan*, 945 F.3d at 1291; *Medina v. Samuels*, No. 20-cv-01443-NYW, 2020 WL 7398772, at *9 (D. Colo. Dec. 17, 2020) (allegations that defendant knew of cancer patient's need for treatment and delayed providing treatment were sufficient to allege subjective component).

To the extent the Sheriff Defendants argue that, because Defendants Gonzales, Bennett, and Taborsky knew that Mr. Kowalski was "on an opioid withdrawal protocol and was being actively monitored by Jail medical staff," this "temper[s] the degree to which [they] can be deemed to have deliberately indifferent," [Doc. 12 at 11], the court disagrees. Defendants cite no legal authority for the proposition that a defendant's knowledge of an inmate's vulnerable health condition and knowledge that the inmate required heightened medical monitoring somehow

24

absolves the defendant of the constitutional responsibility to provide adequate medical care.  In fact, these allegations demonstrate the opposite: allegations that Mr. Kowalski's health was in such a state that he required extra monitoring suggest the importance of promptly responding to emergency calls from Mr. Kowalski's cell.  *Cf. Est. of Blodgett v. Correct Care Sols., LLC*, No. 17-cv-02690-WJM-NRN, 2018 WL 6528109, at *11 (D. Colo. Dec. 12, 2018) (defendant's knowledge of inmate's mental health and suicide watch history "should have triggered an obligation to . . . take 'necessary measures' to prevent or eliminate any immediate danger"); *Paugh*, 2020 WL 4597062, at *31 (the defendant's knowledge that decedent was at high risk of a serious medical problem was relevant in determining whether the defendant was deliberately indifferent when he failed to take any action to assist the decedent).

Nor may the Sheriff Defendants rely on an argument suggesting that, at the time they were allegedly ignoring the emergency call alarms and Mr. Barajas's calls for help, they knew only that "something was happening in [Mr.] Barajas's cell," but purportedly did not know "that [Mr.] Kowalski was in the midst of a medical emergency," *see* [Doc. 12 at 11], to defeat Plaintiff's showing on the subjective prong.  A prison official may not escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know the risk had materialized.  *See Reneau v. Cardinas*, 852 F. App'x 311, 316 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 412 (2021) (unpublished) (finding that a defendant could not rely upon "her own failure to conduct an examination to conclusively establish that she did not in fact draw the inference that [the inmate] had suffered serious injuries" where "the possibility of a serious injury would be obvious even to a layperson"); *see also Farmer*, 511 U.S. at 843 n.8 (a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that

he strongly suspected to exist.").  The relevant question before the court is not whether the Sheriff Defendants disregarded a known substantial harm, but whether they disregarded a *known risk* of substantial harm.  *Farmer*, 511 U.S. at 842 (a plaintiff need not establish that the prison official "believe[ed] that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm.").  Indeed, to rule in the Sheriff Defendants' favor on this point would be to incentivize prison officials to actively avoid responding to emergency calls or answering requests for help so as to ensure that they could later rely upon their own ignorance of any materialized medical harm to escape liability.

For these reasons, the court finds that the Complaint sufficiently alleges an Eighth Amendment deliberate indifference claim against Defendants Gonzalez, Bennett, and Taborsky and thus sufficiently alleges the existence of a constitutional violation for qualified immunity purposes.  The court's inquiry next turns to whether the Complaint sufficiently alleges that these Defendants violated clearly established law.

### B.      Clearly Established Law

Consideration of a qualified immunity defense includes not only whether the defendant violated a constitutional right, but whether that constitutional right was clearly established at the time of the alleged violation.  *Puller*, 781 F.3d at 1196.  "For a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013) (brackets, citation, and internal quotation marks omitted).  The purpose of the clearly established prong is to establish that a prison official had sufficient notice such that he knows, or should know, what conduct will violate a constitutional right.  *See Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2012).  This is a particularized, fact-specific analysis, as it presents

an inquiry into whether a reasonable official would have known, under the then-prevailing conditions, that his conduct violated the plaintiff's rights, and thus a court must take care not to define the right in too general of terms. *Leiser v. Moore*, 903 F.3d 1137, 1140 (10th Cir. 2018). Although a "precise factual correlation between the then-existing law and the case at hand" is not necessary, *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir. 1992) (citation and internal quotation marks omitted), "there must be a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Duncan v. Gunter*, 15 F.3d 989, 992 (10th Cir. 1994) (quotation omitted).

But a plaintiff need not provide case law that is factually identical to its case if the constitutional violation is "obviously egregious . . . in light of prevailing constitutional principles," *A.M. v. Holmes*, 830 F.3d 1123, 1135-36 (10th Cir. 2016), and the Tenth Circuit has noted that a defendant may be on notice that certain conduct violates clearly established law even in novel factual circumstances. *See Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). At bottom, "[t]he clearly-established inquiry focuses on whether the contours of the constitutional right were so well-settled in the context of the particular circumstances that a 'reasonable official would have understood that what he is doing violates that right.'" *Est. of Carrigan v. Park Cty. Sheriff's Off.*, 381 F. Supp. 3d 1316, 1327 (D. Colo. 2019) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (emphasis added)).

In its Complaint, the Estate frames the constitutional right at issue here as the right "to be free from cruel and unusual punishment while being incarcerated within the government-run detention facility." [Doc. 1 at ¶ 103]. The Sheriff Defendants, meanwhile, couch the relevant constitutional right as "the right to an immediate response when a call button in a jail cell is pushed." [Doc. 12 at 14]. While the court must not define a constitutional right too generally,

*Leiser*, 903 F.3d at 1140, it must also take care to not define the constitutional right too narrowly. "If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly." *Kent v. Oakland Cty.*, 810 F.3d 384, 396 (6th Cir. 2016) (quotation omitted). While defining the constitutional right at issue as simply the right to be free from cruel and unusual punishment, as suggested by Plaintiff, would be too broad for qualified-immunity purposes, *see, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."); *Reichle v. Howards*, 566 U.S. 658, 665 (2012) ("Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause."), the court also finds that the Sheriff Defendants' classification of the constitutional right to be examined—the right to an immediate response to an emergency call button—is too narrow for the matter presently before the court.

The crux of Plaintiff's claims is that the Sheriff Defendants were unconstitutionally deliberately indifferent when they failed to respond to Mr. Barajas's sounding of the emergency button and calls for help, which Plaintiffs allege the Sheriff Defendants subjectively knew carried the serious risk of substantial harm to Mr. Kowalski due to the Sheriff Defendants' knowledge of Mr. Kowalski's state of health. *See, e.g.*, [Doc. 1 at ¶¶ 99, 103-04, 106]. Tenth Circuit case law consistently instructs that "when [an inmate] has obvious and serious medical needs, ignoring those needs necessarily violates the [inmate's] constitutional rights," *Quintana*, 973 F.3d at 1033, and further has regularly advised that a delay in providing medical care may "constitute[] an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Mata*,

427 F.3d at 751.  *See also Al-Turki*, 762 F.3d at 1194 (the defendant's "choice to ignore the repeated requests for medical help from an inmate who was experiencing severe abdominal pain potentially caused by a life-threatening condition [] would constitute a violation of the Eighth Amendment."); *Vigil v. Raemish*, No. 18-cv-01499-WJM-NRN, 2019 WL 1429281, at *7 (D. Colo. Mar. 29, 2019), *report and recommendation accepted*, ECF No. 65 ("It cannot be questioned that the government has an obligation to provide medical care for the incarcerated.").

These constitutional principles have been clearly established in the Tenth Circuit for quite some time.  *See, e.g.*, *Quintana*, 973 F.3d at 1033 (finding that, in 2016, it was clearly established that ignoring an inmate's "obvious and serious medical needs" violates the inmate's constitutional rights); *Kellum v. Mares*, 657 F. App'x 763, 768 (10th Cir. 2016) (unpublished) ("It is also clearly established in this circuit that a delay in medical care constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm."); *Est. of Booker*, 745 F.3d at 433 ("[T]here is little doubt that deliberate indifference to an inmate's serious medical need [violates] a clearly established constitutional right") (quotation and alteration marks omitted); *see also Dawson v. Archambeau*, No. 16-cv-00489-MSK-NYW, 2020 WL 209852, at *10 (D. Colo. Jan. 13, 2020) ("[I]t has been clearly established in this Circuit that a deliberate indifference claim will arise when a plaintiff can show that a delay in medical care resulted in substantial harm." (quotation omitted)); *Millward v. Bd. of Cty. Comm'rs of the Cty. of Teton*, No. 17-cv-117-SWS, 2018 WL 9371573, at *10 (D. Wyo. Oct. 19, 2018); ("[I]t was well-established in July 2015 that detention center officials could not disregard a known, serious medical need, which is essentially the deliberate indifference test."); *Est. of Booker*, 745 F.3d at 433 (holding that the "right to timely medical care" was clearly established in 2010).

The Sheriff Defendants argue that it was not clearly established that their failure to provide an "immediate response when a call button in a jail cell is pushed" would violate a constitutional right because they "cannot locate any case law that establishes such a right." [Doc. 12 at 14]. But "Tenth Circuit case law involving deliberate indifference and medical treatment in this context is not so general as to deprive reasonable employees of notice of their constitutional obligation." *Vigil*, 2019 WL 1429281, at *8 (quotation omitted). While the court "recognizes that the clearly established right is not to be defined 'at a high level of generality,' it is also true that 'general statements of the law are not inherently incapable of giving fair and clear warning' to officers." *Capel v. Ottawa Cty. Bd. of Cty. Comm'rs*, No. 17-cv-00325-JED-FHM, 2018 WL 3521180, at *6 (N.D. Okla. July 20, 2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). "[I]n the light of pre-existing law the unlawfulness must be apparent." *White*, 137 S. Ct. at 552. Tenth Circuit case law in which a prison official specifically failed to respond to an emergency call button is not required in light of the significant case law establishing that ignoring an inmate's serious medical needs or requests for medical care or delaying medical care which results in substantial harm may constitute an Eighth Amendment violation. *See, e.g.*, *Est. of Booker*, 745 F.3d at 434; *Al-Turki*, 762 F.3d at 1194-95; *see also Patterson v. Santini*, No. 11-cv-01899-RM-KLM, 2016 WL 11642452, at *5 (D. Colo. Nov. 28, 2016) ("[In 2012] it was clearly established that a prison official's decision to ignore a prisoner's repeated . . . requests for medical treatment[] meet this [unconstitutional] threshold.").[11]

---

[11] The court does not find it material that Plaintiff alleges it was Mr. Barajas, not Mr. Kowalski, who sought medical assistance—indeed, according to the allegations in the Complaint, Mr. Kowalski was unresponsive and seemingly could not have requested medical assistance for himself. *Cf. Weatherford ex rel. Thompson v. Taylor*, 347 F. App'x 400, 401 (10th Cir. 2009) (qualified immunity inapplicable where a prison official failing to check or seek medical attention for an inmate despite other inmates' reports that the inmate was having a heart attack and notice of inmate's symptoms of heart attack).

"[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "And in some cases, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.'" *Stewart v. Beach*, 701 F.3d 1322, 1330 (10th Cir. 2012) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). The court finds that this is such a case. The general constitutional rule consistently identified in the decisional law—that the decision to ignore or delay treatment for an inmate's serious medical need may violate that inmate's constitutional rights— applies with clarity here and was thus clearly established at the time of Mr. Kowalski's 2019 death.

In sum, finds that Defendants Gonzalez, Bennett, and Taborsky were on notice that their alleged decision to ignore calls for help related to Mr. Kowalski's serious medical need could violate Mr. Kowalski's constitutional rights. For these reasons, the court cannot conclude—at the pleading stage—that these Defendants are entitled to qualified immunity with respect to Plaintiff's Claims One and Two. Accordingly, the Motion to Dismiss is **DENIED** insofar as it seeks dismissal of those Claims.[12]

---

[12] Although the Motion to Dismiss cites the relevant legal standards for supervisory liability, *see* [Doc. 12 at 6], it does not expressly challenge the factual allegations asserted against Defendant Taborsky in his supervisory capacity as to Claim Two. *See generally* [*id.*]. Instead, it argues only that Defendant Taborsky is entitled to qualified immunity on Plaintiff's claims generally, an argument which this court has now rejected. [*Id.*]. Because the Motion to Dismiss does not argue that Plaintiff's allegations fail to meet the either prong of the qualified immunity analysis specifically as to the supervisory liability of Defendant Taborsky and does not otherwise argue that Claim Two is deficient, the court finds that the Motion to Dismiss raises no argument as to Claim Two that has not already been addressed in this court's analysis as to Claim One. Thus, the court finds the above analysis is equally applicable to Claim Two as it is to Claim One.

### C.    Municipal Liability

Finally, the Estate raises a municipal liability claim (a "*Monell* claim") against Defendant Shrader in his official capacity.  [Doc. 1 at 20].  "An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works."  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998).  Government entities can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.

In order to state a claim for municipal liability under § 1983, a plaintiff must allege (1) the existence of an official policy or custom; and (2) that the official policy or custom was the driving force behind the constitutional violation alleged.  *Erickson v. City of Lakewood*, 489 F. Supp. 3d 1192, 1205 (D. Colo. 2020). A plaintiff may show the existence of an official policy custom by showing the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation and alteration marks omitted).

The Estate appears to base Claim Three on the existence of an official policy, the failure to implement an official policy or the failure to train, and the existence of an unofficial practice or custom.  The Complaint alleges that Defendant Shrader is responsible for the care of JCDF inmates and has "established policies, procedures, customs, and/or practices for JCDF."  [Doc. 1 at ¶ 11].  According to the Estate, JCDF "had a custom, policy, or practice of acting/failing to act knowingly and with deliberate indifference to serious, emergent medical conditions and/or emergency communications regarding the conditions of its inmates," including Mr. Kowalski.  [*Id.* at ¶ 118].  The Estate further asserts that "JCDF's unconstitutional policies, customs or practices . . . were the legal and proximate cause of Mr. Kowalski's pain and suffering and untimely death."  [*Id.* at ¶ 119].  Moreover, the Complaint asserts allegations suggesting a failure to train and/or a failure to implement an official policy:

> Because JCDF does not have any substantive policies on how detention officers are required to respond to an emergency call button alert, JCDF's deputy training is deficient with regard to what the emergency call button requires of its deputies.  It fails to direct detention officers on the proper way to respond to an emergency call button alert and has failed to issue adequate guidelines to ensure that inmates' serious medical needs are addressed in a prompt manner so that they are not deprived of life-saving medical treatment when inmates (or their cellmates) press the emergency call button.

[*Id.* at ¶ 84].  In support of its allegations, the Estate references other incidents in which a JCDF inmate "died as a result of JCDF's failure to adequately respond to similar types of emergency medical needs."  [*Id.* at ¶ 86]; *see also* [*id.* at ¶¶ 87-90]; [*id.* at ¶ 91].

The Sheriff Defendants argue that the Estate has failed to state a deliberate indifference claim against Defendant Shrader in his official capacity.  [Doc. 12 at 15].  They appear to raise three arguments: (1) Plaintiff has failed to allege the existence of an official policy or custom because Plaintiff does not allege "what the custom consists of or how it was the moving force behind the alleged constitutional harm," [*id.*]; (2) the allegations as to the other JCDF inmate

deaths fail to establish a failure to train or failure to implement a policy, [*id.* at 16-17]; and (3) the Complaint fails to allege an unofficial custom or practice because the "bare allegation that the Sheriff permits staff to inadequately respond to medical emergencies is not plausible" and Plaintiff's reliance on other inmate deaths at JCDF is insufficient to establish an unofficial policy or custom. [*Id.* at 16]. The court addresses these arguments in turn.

### 1.    Official Policy or Custom

"A municipality is liable only when the official policy [or custom] is the moving force behind the injury alleged." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). "A plaintiff must therefore 'identify a government's policy or custom that caused the injury.'" *Cacioppo v. Town of Vail*, 528 F. App'x 929, 931 (10th Cir. 2013) (unpublished) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013)). "The plaintiff must then show 'that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.'" *Id.* (quoting *Schneider*, 717 F.3d at 769). To raise a deliberate indifference *Monell* claim based on the existence of an official policy, "a plaintiff should [identify and] set out the text of that policy." *Leonhard v. Correct Care Sols., LLC*, No. 19-cv-00600-PAB-STV, 2020 WL 1694377, at *8 (D. Colo. Apr. 7, 2020) (citing *Sandberg v. Englewood*, 727 F. App'x 950, 964 (10th Cir. 2018) (unpublished)); *see also Sandberg*, 727 F. App'x at 964 (10th Cir. 2018) (finding that the plaintiff failed to allege an official policy where the complaint "never set[] out the text of any [official] policy"); *Est. of Strong v. City of Northglenn*, No. 17-cv-01276-WJM-MEH, 2018 WL 1640251, at *9 (D. Colo. Apr. 5, 2018) (dismissing *Monell* claim where the complaint "[did] not identify *any* [official] policy, practice, or custom, or any facts tending to show one existed").

Here, the Complaint does not allege any official policy or custom implemented by Defendant Shrader at JCDF that Plaintiff alleges was the moving force behind Mr. Kowalski's injuries. *See generally* [Doc. 1]. Indeed, the Complaint consistently suggests that it is JCDF's alleged *lack* of any official policy that led to Mr. Kowalski's death. *See, e.g.*, [*id.* at ¶¶ 83-85, 94]. Because there are no allegations identifying an official JCDF policy implemented by Defendant Shrader, the court finds that the Estate cannot state a *Monell* claim based on an official custom or policy. *Leonhard*, 2020 WL 1694377, at *8.

## 2. The Failure to Train or Failure to Implement a Policy

Next, the Sheriff Defendants argue that the Complaint fails to plausibly allege a failure to train or a failure to implement a policy related to prison officials' responsibilities when answering emergency calls. [Doc. 12 at 16-17]. The court addresses Defendant Shrader's alleged failure to train and alleged failure to implement a policy together. *See Myers v. Koopman*, No. 09-cv-02802-REB-MEH, 2011 WL 650328, at *6 (D. Colo. Feb. 11, 2011) ("[A] failure to train theory has been seen as a supervisory liability claim that, at bottom, implicates a supervisor's implementation of a policy.") (citing *Dodds v. Richardson*, 614 F.3d 1185, 1209 (10th Cir. 2010) (Tymkovich, J., concurring)); *Kemp v. Law.*, 846 F. Supp. 2d 1170, 1173 (D. Colo. 2012) (considering allegations of a failure to train and failure to implement a policy together). According to the Sheriff Defendants, the Complaint fails to state a *Monell* claim under either theory because the allegations of other inmate deaths at JCDF are insufficient to establish that Defendant Shrader was on notice of the need for better training or better policies. [Doc. 12 at 16-17].

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is

"far more nebulous, and a good deal further removed from the constitutional violation, than was

the policy in *Monell*."). Where a *Monell* claim is based on an alleged failure to train, the plaintiff's

allegations must "reflect[] a 'deliberate' or 'conscious' choice by a [government entity]." *City of

Canton v. Harris*, 489 U.S. 378, 389 (1989).

"The deliberate indifference standard may be satisfied when the municipality has actual or

constructive notice that its action or failure to act is substantially certain to result in a constitutional

violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143

F.3d at 1307. "Policymakers' continued adherence to an approach that they know or should know

has failed to prevent tortious conduct by employees may establish the conscious disregard for the

consequences of their action—the 'deliberate indifference'—necessary to trigger municipal

liability." *Connick*, 563 U.S. at 62 (quotation omitted). But "[w]ithout notice that a course of

training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately

chosen a training program that will cause violations of constitutional rights." *Id.* "Notice of

particular deficiencies in a training program is the crux of a failure-to-train theory." *Est. of Lobato

by & through Montoya v. Correct Care Sols., LLC*, No. 15-cv-02718-PAB-STV, 2017 WL

1197295, at *7 (D. Colo. Mar. 31, 2017).

"A pattern of similar constitutional violations by untrained employees is ordinarily

necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563

U.S. at 62. However, in exceptional circumstances, "deliberate indifference may be found absent

a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or

'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality

fails to train an employee in specific skills needed to handle recurring situations, thus presenting

an obvious potential for constitutional violations." *Barney*, 143 F.3d at 1307-08. The court thus

must determine whether the Complaint sufficiently alleges a pattern of similar constitutional violations so as to put Defendant Shrader on notice of any alleged deficiency in JCDF's training policies.

***Which Other Inmate Incidents the Court May Consider***.  The Complaint alleges that, on four other occasions, an inmate died at JCDF: three while suffering from an opiate withdrawal and one who died due to a drug overdose.  [Doc. 1 at ¶¶ 87-90].  In addition, Plaintiff alleges that a JCDF inmate suffered a stroke while at JCDF which "resulted in him losing muscle control in the right side of his body" (the "*McGill* case").  [*Id*. at ¶ 91].  In each of these instances, Plaintiff alleges, the inmate pressed the emergency call button in his or her cell to alert JCDF staff of a medical emergency, and in each of these instances, no JCDF staff responded to the emergency to provide medical assistance.  *See* [*id*. at ¶¶ 87-91].  According to the allegations in the Complaint, one of these instances occurred in 2015, one occurred in 2016, and two occurred in 2020.  [*Id*. at ¶¶ 87-90].  And while the Complaint does not allege the date on which the JCDF inmate had a stroke, the Complaint indicates that a civil action arising out of that incident was filed in 2013—which suggests to the court that the incident occurred in 2011 or 2012.  *See* [*id*. at ¶ 91].[13]

The Sheriff Defendants argue that these incidents cannot demonstrate that Defendant Shrader was on notice in March 2019 of the need for more or different training policies with respect to the emergency call button.  [Doc. 12 at 17].  Specifically, the Sheriff Defendants argue that the two 2020 deaths cannot be relied upon to establish municipal liability because they occurred after Mr. Kowalski's death, and further assert that the remaining three incidents are factually

---

[13] While a court may "take judicial notice of its own files and records," the documents "may only be considered to show their contents, not to prove the truth of matters asserted therein."  *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006) (quotations omitted).  Thus, the court cannot take judicial notice of the year in which the earliest JCDF inmate death occurred.  *Schendzielos v. Silverman*, 139 F. Supp. 3d 1239, 1251 (D. Colo. 2015).

distinguishable from Mr. Kowalski's case and thus cannot demonstrate a pattern of constitutional violations.  [*Id.*].  In response, Plaintiff asserts that the Sheriff Defendants' argument "confuses the concepts of 'notice' for the purpose of identifying the need for policy changes and/or training with evidence of an ongoing custom, policy, or practice, including the absence of policies or training, for the purpose of *Monell* liability." [Doc. 26 at 20-21].  Moreover, according to Plaintiff, these prior instances of inmate death "provided JCDF extensive notice that there were policy and training deficiencies related to responding to the emergency call button and an informal custom of ignoring it."  [*Id.* at 20]; *see also* [*id.* at 21 (arguing that the three preceding jail events provide notice of a training deficiency)].

While the court agrees with Plaintiff that the question of whether an alleged pattern of events is sufficient to demonstrate a deficiency in a municipal entity's training is a separate inquiry from whether an alleged pattern of events is sufficient to *put a municipal defendant on notice* of the need for an improved policy, the latter inquiry is nevertheless highly relevant here.  As set forth above, to state a *Monell* claim based on a failure to train, the plaintiff must sufficiently allege that the municipal defendant had notice of the deficiency in training: notice is the "crux" of the failure-to-train theory.  *Est. of Lobato*, 2017 WL 1197295, at *7.  Thus, even if the court assumes, pursuant to Plaintiff's argument, that the 2020 deaths "provide evidence of an ongoing custom," [Doc. 26 at 21], the incidents that occurred subsequent to Mr. Kowalski's death cannot be relied upon to establish that Defendant Shrader was on notice that, *prior to Mr. Kowalski's death*, the JCDF insufficiently trained its employees as to answering emergency calls.  *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1286 (10th Cir. 2019) ("Incidents that occurred subsequent to the incident at issue in this case cannot have provided Denver with notice of a deficiency in its training program before that incident, and thus they cannot be used as evidence that, prior to Deputy Lovingier's

use of force against Mr. Waller, Denver 'decisionmakers . . . deliberately chose[] a training program that w[ould] cause violations of constitutional rights.'") (quoting *Connick*, 563 U.S. at 62) (alteration marks in original)).  The court thus does not consider the 2020 deaths in determining whether Defendant Shrader was on notice of any deficiencies in training.

**Whether Defendant Shrader Was Notice of a Deficiency in Training**.  Plaintiff argues that the three inmate incidents preceding Mr. Kowalski's death provide notice of a municipal training deficiency so as to demonstrate that Defendant Shrader knew of a need for better training. [Doc. 26 at 21].  The Sheriff Defendants, meanwhile, contend that the three earlier incidents are factually distinct from Mr. Kowalski's death and are insufficient to show any pattern of unconstitutional behavior so as to put Defendant Shrader on notice.  [Doc. 12 at 17-18].  Even taking the alleged facts as true, this court concludes that Plaintiff has not alleged sufficient facts of "[a] pattern of similar constitutional violations" so as to show that Defendant Shrader was on notice that his continued alleged failure to train would cause violations of constitutional rights. *Waller*, 932 F.3d at 1285, albeit for slightly different reasons.

As a preliminary matter, the two prior deaths—as pled by Plaintiff—do appear to be superficially factually similar to Mr. Kowalski's circumstances: a JCDF inmate experienced a medical emergency related to opioid withdrawal, pressed the jail cell emergency call button, did not receive medical attention from JCDF staff, and died.  *See* [Doc. 1 at ¶¶ 88, 90]; *see also Est. of Lobato*, 2017 WL 1197295, at *8 (noting that, to show a defendant's notice of the need for better training based on a pattern of prior incidents, the incidents "must be sufficiently similar" to the conduct at hand).  The court notes, however, that the Complaint contains minimal factual details about these prior incidents.  *See* [Doc. 1 at ¶¶ 88, 90-91].  The third example, the *McGill* case,

appears unrelated to any type of opioid or drug withdrawal and did not result in death.  *See* [*id.* at ¶ 91].

Even taking into account all three instances, the court is nevertheless not persuaded that they are sufficient to allege that Defendant Shrader had notice of a "pattern of unconstitutional behavior."  *Barney*, 143 F.3d at 1308.  First, the *McGill* case, which resulted in a jury verdict for the plaintiff, [Doc. 1 at ¶ 91], stemmed from a finding that JCDF's private medical contractor, Correctional Healthcare Companies, "had unconstitutional policies or informal customs regarding their response to medical emergencies" and "had constitutionally deficient training and supervision of nurses in JCDF" – not the municipality itself.  *Id.*  Second, the Complaint does not allege the municipality was found responsible or liable, either through an internal investigation or through litigation, for any constitutional violations resulting from any incident pre-dating Mr. Kowalski's death.  *See* [*id.* at ¶ 88].  Third, the deaths of Patrick O'Day in 2016 and Jennifer Lobato in 2015, though troubling, are not temporally proximate to the death of Mr. Kowalski.  Fourth, the Complaint does not contain allegations as to whether these same individual Defendants were at JCDF at the time, let alone involved in the incidents so as to give the municipality notice that different or better training was required.

Accordingly, the court is not persuaded that the allegations related to the incidents predating Mr. Kowalski's death in March 2019 are sufficient to demonstrate that Defendant Shrader was on notice of a "pattern of similar *constitutional violations*."  *Waller*, 932 F.3d at 1285; *see also Est. of Lobato*, 2017 WL 1197295, at *8 (explaining that allegations in a complaint, without more, "do not put the [municipal] defendants on notice" that their training was deficient, and a lawsuit resulting in liability was "the only relevant grounds for notice to the [municipal] defendants of their failure to train their employees.") (emphasis added).  *Cf. Coffey v. McKinley*

*Cty.*, 504 F. App'x 715, 719 (10th Cir. 2012) (unpublished).  Nor do the allegations, taken as true, suggest that Defendant Shrader "deliberately chose[] a training program that [would] cause violations of constitutional rights."  *Connick*, 563 U.S. at 61.

Nor does the court find that the allegations in the Complaint present the "rare" and "narrow range of circumstances" where "a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction" so as to permit Plaintiff to proceed on a failure-to-train theory absent allegations of a pattern of unconstitutional conduct.  *Waller*, 932 F.3d at 1284 (quoting *Barney*, 143 F.3d at 1307-08).  To establish deliberate indifference without a pattern of violations, Plaintiff must allege that Defendant Shrader was on notice that it was "highly predictable that [Defendants Gonzalez, Bennett, and Taborsky] would face a difficult choice of the sort that training or supervision will make less difficult."  *Id.* at 1288 (quoting *R.A. v. City of N.Y.*, 206 F. Supp. 3d 799, 803 (E.D.N.Y. 2016)).  As in *Waller*, this case "does not involve [allegations of] technical knowledge or ambiguous 'gray areas' in the law that would make it 'highly predictable' that a jail official would need special training to know how to respond to an emergency call button.  *Id.*  Indeed, the Complaint does not allege that these Defendants, when they heard or saw that the emergency call button had been activated, faced a difficult decision as to whether they should respond and would have thus benefitted from more training; instead, the Complaint alleges that the Defendants knew or should have known that a medical emergency was occurring.  [Doc. 1 at ¶¶ 69, 71].  The Complaint further alleges that JJCDF had an opioid withdrawal protocol, and the individual Defendants knew that Mr. Kowalski was on such protocol [*Id.* at ¶ 99].  Particularly given the Supreme Court's instruction that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *Connick*,

563 U.S. at 61, this court finds that the Complaint fails to plead allegations to state a *Monell* claim based on a failure-to-train theory.

### 3.      Informal Policy or Custom

Finally, the court must address whether the Complaint states a claim based on an informal policy or custom.  In its Response, Plaintiff states that one of three bases for its *Monell* claim is the notion that "JCDF has developed a practice and/or custom of permitting and acquiescing in its detention officers' disregard of inmate emergencies, including failing to respond to inmate communications about such emergencies."  [Doc. 26 at 17].  The Sheriff Defendants argue that listing medical incidents occurring at JCDF is insufficient to meet Plaintiff's burden, and the "bare allegation that [Defendant Shrader] permits staff to inadequately respond to medical emergencies is not plausible, especially given the Complaint's allegations that [JCDF] has a medically-administered protocol for individuals known to be withdrawing."  [Doc. 12 at 16].  In response, Plaintiff contends that "the prior jail instances provided JCDF extensive notice that there [was] . . . an informal custom of ignoring [the emergency call button]" and argues that JCDF has "engag[ed] in a practice and/or custom of ignoring emergency call buttons when an inmate was having a medical emergency."  [*Id.* at 20].

A plaintiff may state a *Monell* claim based upon "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is *so permanent and well settled* as to constitute a custom or usage with the force of law."  *Bryson*, 627 F.3d at 788 (emphasis added).  "With informal, unwritten policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct—no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible—or use

other evidence, such as a [prison official's] statements attesting to the policy's existence." *Sexton v. City of Colo. Springs*, 530 F. Supp. 3d 1044, 1070 (D. Colo. 2021) (quoting *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015)).  Because the Complaint relies on the existence of an alleged pattern of similar incidents, *see* [Doc. 1 at ¶¶ 86-92], the court must determine whether the Complaint sufficiently alleges the existence of a "widespread practice" that is "so permanent and well settled" so as to constitute a custom with the force of law. *Bryson*, 627 F.3d at 788.

*Whether Plaintiff Has Alleged a Pattern of Similar Misconduct*.  The court first considers whether the two deaths occurring after Mr. Kowalski's death may be considered in determining whether the Complaint sufficiently alleges a pattern of misconduct "amounting to a widespread practice" that is "permanent and well settled" under a theory of liability based on an informal policy or practice, rather than failure to train.  As discussed above, only incidents occurring prior to Mr. Kowalski's death could put Defendant Shrader on notice of the existence of unconstitutional misconduct at the time of his death.  *See supra* Section II.C.2.  Plaintiff argues that "[p]ost-incident conduct . . . is only irrelevant when there is an absence of additional examples supporting the implicated pattern, practice, and/or failure to train/supervise in existence before the incident," relying on *Waller*.  [Doc. 26 at 21].  The Sheriff Defendants disagree, arguing that *Waller* does not support Plaintiff's argument.  [Doc. 35 at 10].

While this court agrees that *Waller* does not stand for the proposition that post-incident conduct is only irrelevant when there is an absence of additional examples supporting the implicated pattern or practice, it also does not read *Waller* to preclude *per se* the consideration of post-incident conduct for the purpose of considering whether there was an informal policy and custom at that time of Mr. Kowalski's death.  Subsequent events might be further circumstantial

evidence of the existence of an informal policy or custom at the time of the constitutional violation at issue. *Cf. Waller*, 932 F.3d at 1286-87, 1290.  District courts in the Tenth Circuit prior to *Waller* observed such.  *See Lindquist v. Arapahoe Cty.*, No. 10-cv-02264-REB-MEH, 2011 WL 3163095, at *2 (D. Colo. July 26, 2011) (citing *Estate of Rice ex rel. Garber v. City & Cty. of Denver*, No. 07-cv-01571-MSK-BNB, 2008 WL 2228702, at *6 (D. Colo. May 27, 2008)); *Martinez v. Cornell Corrs. of Tex.*, 229 F.R.D. 215, 223-24 (D.N.M. 2005) (compelling production of documents concerning similar claims without a time frame stating,"[t]here is a reasonable argument that subsequent acts or conduct may be admissible to establish municipal liability).

But the relevancy turns on the similarity in nature of the alleged conduct to the asserted constitutional violation, as well as the relative time period.  The *Waller* court ultimately considered only events pre-dating the alleged constitutional violation in analyzing whether the plaintiff had raised sufficient allegations of a widespread informal custom.  *Waller*, 932 F.3d at 1290.  Here, the incident at issue occurred in March 2019.  [Doc. 1 at ¶¶ 55-56].  The two post-incident events alleged involving a detainee experiencing a life-threatening emergency during drug withdrawal occurred in January 2020 and May 2020.  *See* [*id.* at ¶¶ 87, 89].  Ultimately, even considering all the incidents alleged, the court is respectfully not persuaded that these incidents demonstrate a widespread practice or custom of JCDF "permitting and acquiescing in its detention officers' disregard of inmate emergencies, including to respond to inmate communications about such emergencies, which has culminated in *routine* failure to address serious medical needs as they reach emergency status."  *See* [*id.* at ¶ 92 (emphasis added)].

While the court acknowledges that the prior deaths appear to be facially similar to the circumstances surrounding Mr. Kowalski's death, the court cannot conclude that allegations of two incidents occurring several years prior to Mr. Kowalski's death and occurring over a span of

four to five years plausibly establish a "widespread practice" that is "so permanent and well settled as to constitute a custom or usage with the force of law," *Bryson*, 627 F.3d at 788, nor a "routine" failure to address serious medical needs. *See Sexton*, 530 F. Supp. 3d at 1070 ("The Court finds that two alleged incidents, one in 2013 and one in 2019, are insufficient to show a practice so permanent and well settled that it constitutes a custom or usage with the force of law."); *Est. of Reat v. Rodriguez*, No. 12-cv-02531-REB-MEH, 2013 WL 3010828, at *5 (D. Colo. June 17, 2013) (three instances spread over twenty years insufficient to allege pattern); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) ("[T]hree incidents" in a four-year period "were too few to indicate that the City had a widespread custom of which City policymakers had reason to be aware"); *Abila v. Funk*, No. CV 14-1002 JB/SMV, 2016 WL 9021834, at *19 (D.N.M. Dec. 14, 2016) (citing cases in support of the statement that "two or three instances will not suffice" to establish practice or custom).[14]  Similarly, if the court considers the fourteen month time period starting with Mr. Kowalski's death in March 2019 and ending with Mr. Abeyta's death in May 2020, the same number of events – three – is still insufficient, standing without further allegations, to establish a "widespread practice."  *Gable*, 296 F.3d at 538.  The court thus concludes that Plaintiff has not met its pleading burden so as to state a *Monell* claim based on an unofficial practice or custom of permitting JCDF deputies to disregard inmate emergencies.

Finally, insofar as Plaintiff's Complaint could be construed as asserting a policy or custom based on a ratification theory, *see* [Doc. 1 at ¶ 92 ("JCDF has developed a practice and/or custom of permitting and acquiescing in its detention officers' disregard of inmate emergencies, including

_____

[14] *But see Est. of Valverde by & through Padilla v. Dodge*, No. 16-cv-01703-MSK-MEH, 2017 WL 3530282, at *4 (D. Colo. Aug. 17, 2017) (finding that three instances of similar conduct "could plausibly demonstrate the existence of an informal custom or practice"); *cf. Sexton*, 530 F. Supp. 3d at 1071 (noting that the incidents in *Valverde* "had taken place in the prior two years").

failing to respond to inmate communications about such emergencies")], "[r]atification is more than acquiescence," *Jack v. Cty. of Stanislaus*, 2017 WL 4123930, at *7 (E.D. Cal. Sept. 15, 2017), and "a municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's *specific unconstitutional actions*, as well as the basis for these actions." *Bryson*, 627 F.3d at 790 (emphasis added).   The Complaint does not allege that Defendant Shrader ratified the specific actions of Defendants Gonzalez, Bennett, or Taborsky at issue in this case, [Doc. 1], and the allegations that JCDF had a policy or practice of "permitting and acquiescing in its detention officers' disregard of inmate emergencies" is insufficient to state a *Monell* claim based on ratification.  *Jack*, 2017 WL 4123930, at *7.

For the reasons set forth above, the court finds that the allegations in the Complaint are insufficient to allege the existence of either an official policy, a failure to train, or the existence of an unofficial practice or custom so as to state a *Monell* claim against Defendant Shrader.  As a result, the court will **GRANT** the Motion to Dismiss in part and **DISMISS without prejudice** Plaintiff's Claim Three against Defendant Shrader.[15]

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1)   The Sheriff Defendants' Motion to Dismiss [Doc. 12] is **GRANTED IN PART** and **DENIED IN PART**;

(2)   Plaintiff's Claim Three is **DISMISSED without prejudice**;

(3)   Defendant Shrader is **DISMISSED** as a Defendant in this matter;

---

[15] However, given the short time period between Mr. Kowalski's and Mr. Abeyta's deaths, and the asymmetry of information between Plaintiff and Defendants, this court will permit Plaintiff tailored discovery as to similar incidents involving an individual pressing an emergency call button while subject to the opioid protocol and responses by JCDF for a limited time period should it seek such discovery.  Should such discovery yield information Plaintiff which believes would support a *Monell* claim, Plaintiff may move to amend its then-operative complaint.

(4)     Plaintiff is **ORDERED** to file an Amended Complaint within seven days of the

entry of this Order, <u>amending only the constitutional bases of its surviving claims</u>;

and

(5)     Within fourteen days of the filing of the Amended Complaint, the Sheriff

Defendants **SHALL FILE** an answer to Plaintiff's Amended Complaint.


DATED:  January 3, 2022                              BY THE COURT:

                                                      _____
                                                      Nina Y. Wang
                                                      United States Magistrate Judge