**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-CV-00827-NYW

ESTATE OF JOHN KOWALSKI, by and through its P.R. DENISE KOWALSKI,

     Plaintiff.

v.

MARIO GONZALEZ,
GREG BENNETT,
SCOTT TABORSKY,
CHRISTINA MESSER,
DESIREE SALAZAR,
BRIANDA MANCHA, and
WELLPATH, LLC

     Defendants.

_____

**FIRST AMENDED COMPLAINT AND JURY DEMAND**
_____

Plaintiff, Estate of John Kowalski, by and through its attorneys of the Civil Rights Litigation Group, PLLC, hereby submit this First Amended Complaint and Jury Demand, and allege as follows:

**INTRODUCTION**

1. This is a civil rights and negligence action for the death of John Kowalski resulting from deliberate indifference to his serious medical needs, while he was a pre-trial detainee at the Jefferson County Detention Facility. While in custody, Kowalski suffered from opiate withdrawal and passed out and had a seizure in the shower. Kowalski's conditions were communicated to detention officers and medical personnel responsible for caring for Kowalski. However, he was not provided adequate medical care nor provided life-preserving checkups as required by policy.

1

As a result, he became gravely ill and went into cardiac arrest. His cellmate activated the emergency call button repeatedly and yelled and pounded on the cell door desperately trying to get the attention of deputies to come help Kowalski. Deputies nearby in the control workstation saw and/or heard the emergency call light/alarm indicator for Kowalski's cell signal an emergency for at least 20 minutes but deliberately ignored it. By the time deputies finally arrived, Kowalski had been deprived of oxygen to his brain for too long. Kowalski was transferred to a local hospital and pronounced braindead. He died a week later. Had deputies only responded earlier instead of ignoring him, Kowalski would be alive today. Kowalski's estate seeks compensation for his needless death, pain and suffering as he was dying in his cell, and punitive damages sufficient to compel Jefferson County and its deputies to treat its inmates with the constitutionally required respect, compassion, and care they deserve.

<u>**JURISDICTION AND VENUE**</u>

2.      Plaintiff's claims are brought pursuant to 42 U.S.C. §1983 and the Constitution and laws of the United States and state law.

3.      This Court has jurisdiction of the subject matter pursuant to 28 U.S.C. §1331.

4.      Supplemental jurisdiction over state law claims is conferred by 28 U.S.C. §1367.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because all the events alleged herein occurred in the State of Colorado.

6.      Jurisdiction supporting the Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. §1988.

## PARTIES

7. Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

8. John Kowalski was at all times relevant to the claims set forth herein a resident of the State of Colorado. Mr. Kowalski is survived by his natural-born mother, Denise Kowalski. Denise Kowalski is the personal representative of the Estate of John Kowalski.

9. Jefferson County was, at all times relevant to the subject matter of this Complaint, a County in Colorado.

10. Jefferson County Detention Facility ("JCDF") is a county jail located in Jefferson County, Colorado.

11. Defendant Mario Gonzales was, at all times relevant to the subject matter of this Complaint, a sheriff's deputy and detentions officer with JCDF and acting under color of law. He is hereby identified in his individual capacity.

12. Defendant Greg Bennett was, at all times relevant to the subject matter of this Complaint, a sheriff's deputy and detentions officer with the JCDF and acting under color of law. He is hereby identified in his individual capacity.

13. Defendant Sergeant Scott Taborsky was, at all times relevant to the subject matter of this Complaint, a sergeant with JCDF who was responsible for the supervision of deputies at JCDF. He was at all relevant times a detentions officer and acting under color of law. He is hereby identified in his individual capacity.

14. Defendant Wellpath, LLC is a Delaware limited liability company doing business in Colorado. Wellpath, LLC employs medical professionals and contracts with Colorado facilities

3

for the provision of medical services to inmates including JCDF. Wellpath has previously been known by several other names, including Correct Care Solutions ("CSC") and Correctional Healthcare Companies ("CHC").

15.     Defendant Christina Messer is an RN and was employed by contractor Wellpath, LLC to provide medical services at JCDF. She was acting under color of law as a government contractor and as a registered nurse and is hereby identified in her individual capacity.

16.     Desiree Salazar is an LPN and was employed by contractor Wellpath, LLC to provide medical services at JCDF. She was acting under color of law as a government contractor and as a licensed practical nurse and is hereby identified in her individual capacity.

17.     Defendant Brianda Mancha is an LPN and was employed by contractor Wellpath, LLC to provide medical services at JCDF. She was acting under color of law as a government contractor and as a licensed practical nurse and is hereby identified in her individual capacity.

## BACKGROUND FACTS

18.     Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

19.     On March 18, 2019, John Kowalski ("Kowalski") was arrested and booked into JCDF as a pretrial detainee.

20.     Kowalski suffered from substance abuse disorder, having become addicted to opiates following an orthopedic surgery on his shoulder to repair an injury.

21.     Substance abuse disorder is a recognized mental health disorder.

22.     Long-term opiate abuse leads to physical dependence, which causes withdrawal.

4

23.     It is well known, particularly in jails and correctional facilities, that opiate withdrawal often causes severe dehydration, vomiting and diarrhea, which can lead to death. When a person is severely dehydrated, his or her potassium becomes depleted. Potassium is an electrolyte critical to the regulation of one's heartbeat. When potassium is depleted, a person can no longer regulate his or her heartbeat and the heartbeat becomes irregular (arrhythmia). Arrhythmia of this nature leads to full cardiac arrest because the heart can no longer function.

24.     Passing out (syncope) is most often caused by a sudden drop in blood pressure and indicates possible arrhythmia.

25.     Seizures can result from a variety of different related medical issues.

26.     On the morning of March 20, 2019, at approximately 7:00 a.m., Kowalski passed out in the shower, fell, and had a seizure.

27.     Medical personnel, including RN Christina Messer, LPN Desiree Salazar, and EMT Katie Ervin responded and evaluated Kowalski. They were aware that Kowalski has passed out and fell and observed him seizing on the shower floor when they arrived.

28.     Kowalski communicated to Defendant Messer and Salazar that he was a heavy opioid user and had been suffering from many of the typical symptoms of opiate withdrawal.

29.     Kowalski was nauseous, vomiting, dizzy, anxious, agitated, restless, and sweating and had headaches, diarrhea, severe muscle aches/cramps, tremors, abdominal cramping, goosebumps, runny nose (not caused by cold or allergies), and pins and needles sensation.

30.     By this time, Kowalski was in fully-developed and acute opioid withdrawal having not used opioids in several days.

31.      Personnel, including medical personnel and detention officers, would have been on notice of this type of condition and would have known of the signs, symptoms, and risks of this type of condition, most importantly that opiate withdrawal can result in severe dehydration and ultimately, death, and that Kowalski was at risk.

32.      Medical personnel were well aware that Kowalski was in the acute stage of opioid withdrawal because of the severity of his symptoms and that he was in the stage of withdrawal where the risk of dehydration and death is highest.

33.      JCDF policy dictates that inmates suffering from opiate withdrawal be identified, flagged in the system, given Gatorade which contains potassium and other electrolytes to help correct the imbalance caused by dehydration from vomiting and diarrhea, and monitored three times a day by medical personnel to ensure the condition be controlled and does not worsen or become life-threatening.

34.      Defendants Messer and Salazar failed to perform or refer Kowalski for further evaluations and tests to determine the cause of and treat Kowalski's syncope and seizures. At a minimum, they should have done an EKG to check that Kowalksi's heart was functioning properly, check and monitor his irregular heart performance, and make sure he was not susceptible to cardiac arrest.

35.      However, Defendants Messer and Salazar did nothing to further diagnose the cause of Kowalski's syncope and seizures and treat these medical conditions. These Defendants only evaluated him for opioid withdrawal and flagged him in the system for withdrawal monitoring.

6

36.    Under the withdrawal monitoring protocol, inmates are required to be checked each day at 9:00 a.m., 4:00 p.m., and 11:00 p.m. The 7-hour daytime spread is critically important for monitoring this type of condition.

37.    Kowalski was checked by LPN Desiree Salazar at approximately 5:02 p.m. who noted that he additionally was suffering from vomiting and/or diarrhea.

38.    Kowalski was checked by LPN Brianda Mancha at approximately 7:31 who noted that he additionally suffered multiple episodes of vomiting and/or diarrhea.

39.    Kowalski was checked at 7:30 p.m. instead of the scheduled time of 11:00 p.m., only 3.5 hours after he had already been checked and 13.5 hours before he was scheduled to be checked again. He was checked at an inappropriate time contrary to policy because it was inconvenient to check later when the inmates were doing laundry exchange.

40.    Defendants Salazar and Mancha were aware from the medical records and other pass-on communications that Kowalski had also passed out, fell, and had a seizure but no further examinations or tests had been conducted to evaluate and treat Kowalski's condition.

41.    Defendants Salazar and Mancha observed that Kowalski's condition had worsened and that he had not consumed the Gatorade provided to him, despite having more vomiting and diarrhea, which put him at further risk for severe dehydration, arrhythmia, and cardiac arrest.

42.    Defendants Salazar and Mancha did nothing further to evaluate or treat Kowalski despite his worsening condition, further dehydration, and knowledge that he had passed out and had a seizure earlier.

43.    Despite this knowledge, Defendant Mancha checked on Kowalski early knowing that no one would check on him again or provide him more Gatorade for 13.5 hours and he would

become more dehydrated and have further depletion of the potassium necessary to regulate his heartbeat.

44.    Defendants Messer, Salazar, and Mancha ("the Medical Defendants") all should have reasonably known from these facts and as medical professionals that there was a substantial risk that Kowalski would have arrhythmias due to dehydration and may go into cardiac arrest and die.

45.    Defendants Salazar and Mancha knew that the standard of care for a patient in Kowalski's condition required an EKG and/or heart monitoring, but failed to perform or refer for those evaluations.

46.    Defendant Wellpath, LLC did not have policies or procedures to direct the Medical Defendants on how to address these more severe medical issues and failed to adequately train and supervise the Medical Defendants in providing the appropriate standard of care.

47.    Jail deputies are informed when an inmate is on opioid withdrawal monitoring so that they know an inmate is seriously ill and may have emergent life-threatening medical needs.

48.    Around the time Kowalski was placed on opioid withdrawal monitoring, Deputy #2007 entered a note in the file that Kowalski had passed out or had a seizure in the shower so deputies on duty later would be aware of Kowalski's serious medical issues.

49.    Due to being on withdrawal monitoring, Kowalski was moved to a lower-level unit in module 6B, designed for monitoring inmates with medical needs, with cellmate John Ignacio Barajas.

50.    On or about 10:00 p.m. inmates were locked down in their cells for the night.

8

51.    By on or about 11:00 p.m. the lights had been turned off and inmates, including Barajas and Kowalski, were in bed in their cells sleeping. The floor was quiet because the inmates had just concluded laundry exchange and everyone was settling in for the night.

52.    At this time, Defendant Deputies Mario Gonzalez, Chaun Johnson, and Greg Bennett (the "Jail Defendants") were on duty in module 6B and were being supervised by Defendant Sergeant Scott Taborsky.

53.    It would have been apparent to everyone who saw or heard about Kowalski on March 20, 2019, including the named Defendants, that he was severely ill because he was not drinking Gatorade or food provided to him, he had fallen and seized in the shower, and he was vomiting, lying in bed, and looked severely unwell, in a detention cell designed for persons suffering from medical conditions.

54.    On or about 11:03 p.m., Barajas heard Kowalski making strange, raspy, choking, and gurgling breathing sounds. Barajas then saw Kowalski having a hard time breathing and not responding to requests asking if he was "ok." Barajas shook and tapped him for a response, but got nothing from Kowalski.

55.    Kowalski was not responding and had labored breathing because he was experiencing severe cardiac arrhythmia (irregular heartbeat) and was about to go into complete cardiac arrest. His cardiac arrhythmia was likely caused by a lack of potassium from severe dehydration rendering him unable to regulate his heartbeat. With this kind of arrhythmia, complete cardiac arrest is imminent.

56.     Deputies and supervisors are assigned to and responsible for inmates in specific housing units during their shift. They monitor inmates in those units from workstations located in each housing unit.

57.     JCDF cells are equipped with emergency call buttons to be used by inmates for emergencies. The emergency call button in cells activates an alert with a flashing light and/or noise at the workstation to alert deputies to an emergency in their housing unit.

58.     JCDF staff, including the Jail Defendants, knew that Kowalski's jail cell was equipped with an emergency call button and referred to the button as an "emergency call button."

59.     Barajas repeatedly pressed the emergency call button trying to get the attention of deputies to help Kowalski. No one responded.  After approximately 10 minutes of Kowalski being non-responsive, he pressed the emergency call button yet again.

60.     Barajas repeatedly pounded hard on the cell door and yelled "hey, hey" and "help" trying to get the attention of deputies to help Kowalski.

61.     While this was happening, the Jail Defendants were visibly standing at the nearby workstation conducting ordinary, non-emergent business. Deputy Gonzalez was briefing Sergeant Taborsky about an incident that had occurred earlier in the day involving an altercation between inmates.

62.     Each of the deputies and sergeant saw and/or heard the emergency call button continually alarming that a medical emergency was occurring in Kowalski's cell.

63.     Deputies were close enough to hear Barajas yelling and pounding on the cell door and see his face at the cell window. Kowalski's cell was located directly in front of the workstation approximately 40 feet away with no walls in between to obstruct sound. Cell doors are thin enough

10

that deputies can converse with inmates through the door at a normal speaking volume. Deputies certainly would have heard Barajas yelling and pounding on the door while seeing that the emergency call button was also activated because the floor was otherwise quiet.

64.    The Jail Defendants had been previously put on notice that Kowalski was in withdrawal and on opioid withdrawal monitoring because deputies are routinely provided this information in verbal and/or written pass-on notes so that they can properly observe an inmate who is seriously ill and may have emergent life-threatening medical needs.

65.    The Jail Defendants also had notice of Kowalski's medical conditions from the file note that Kowalski had passed out and had a seizure earlier that day.

66.    Additionally, the Jail Defendants observed that Kowalski was seriously ill throughout the day, not eating, and did not get out of bed for a headcount on or about 10:00 p.m. in the course of doing their walkthroughs to monitor inmates.

67.    The Jail Defendants all knew or should have reasonably known based on this information, combined with the emergency call button alert and Barajas yelling and pounding on the door, that Kowalski was having a serious medical emergency.

68.    Despite this information, the Jail Defendants all ignored the emergency call button alert for at least 15-20 minutes, while Barajas yelled and pounded on the cell door, and while the detention officers talked and conducted ordinary, non-emergent business.

69.    Instead of responding to what they knew or should have known was an emergency, Deputy Gonzalez and Sergeant Taborsky (as a supervisor) decided not to respond, and instead to complete their discussion.

11

70.     Afterward, Sergeant Taborsky left and went about other ordinary business. Deputy Gonzalez started his regular "walk-through" of the unit to monitor all inmates. Deputies Johnson and Bennett did nothing to respond to Kowalski's cell.

71.     As Deputy Gonzalez was doing his walkthrough by Kowalski's cell, Barajas got his attention and he stopped at Kowalski's cell. Barajas informed Deputy Gonzalez through the door that Kowalski was not responding.

72.     Barajas asked why it had taken him so long and he said it was because he had been talking with Sergeant Taborsky about an incident earlier in the day.

73.     Deputy Gonzalez then entered the cell and tried to speak to Kowalski and shook him, but got no response. He then rolled him over and discovered that Kowalski had no pulse and his face was purple from lack of oxygen.

74.     Deputy Chaun Johnson arrived in the cell immediately after Deputy Gonzalez. The deputies began CPR and radioed a request for medical personnel to respond.

75.     Deputies Greg Bennett and Barry LeCavalier, who was with an inmate in the module next door, arrived at Kowalski's cell immediately after Deputies Gonzalez and Johnson.

76.     Kowalski had gone into cardiac arrest some 15 minutes earlier while the Jail Defendants were at the work station ignoring the emergency call button. By the time deputies got to his cell, his heart had not been beating and getting oxygen to his brain for at least 15 minutes.

77.     By the time deputies bothered to see why Barajas was making a ruckus and repeatedly hitting the emergency call button, Kowalski was most likely brain dead and would never recover.

78. Deputies and medical personnel performed CPR and defibrillated Kowalski for approximately 10-15 minutes before they were able to get his heart beating again.

79. Kowalski was taken to the hospital where he was later pronounced brain dead due to the sustained lack of oxygen to his brain during the time it took deputies to respond to the emergency call and Barajas yelling and pounding on the cell door for help.

80. Kowalski died on March 28, 2019, at the age of 27.

81. At the time, JCDF has no written policies regarding a deputy's responsibilities/obligations when an inmate presses the emergency call button, including, but not limited to, requirements that deputies respond to the emergency call button alert, that they respond immediately and without delay, that they prioritize responding over other ordinary jail business, and that emergency call buttons being used by inmates with known serious medical needs warrant particular urgency and attention so that serious medical needs can be addressed in a prompt manner and so that inmates like Kowalski are not deprived of life-saving medical treatment.

82. Because JCDF does not have any substantive policies on how detention officers are required to respond to an emergency call button alert, JCDF's deputy training is deficient with regard to what the emergency call button requires of its deputies. It fails to direct detention officers on the proper way to respond to an emergency call button alert and has failed to issue adequate guidelines to ensure that inmates' serious medical needs are addressed in a prompt manner so that they are not deprived of life-saving medical treatment when inmates (or their cellmates) press the emergency call button.

83. In the absence of appropriate policy and/or training, JCDF has allowed its officers to engage in a custom of inadequate responses in the face of medical emergencies.

13

84.     For example, within the past six years, at least five other JCDF inmates have died as a result of JCDF's failure to adequately respond to similar types of emergency medical needs.

85.     On May 1, 2020, Paul Abeyta died while incarcerated at JCDF as a result of complications from opioid withdrawal. Mr. Abeyta informed the detention staff that he had been a daily heroin user for the past five years and he had been suffering from symptoms including fever, cough, and shortness of breath. Mr. Abeyta was transferred to the medical unit of the jail where he was supposed to be routinely checked on by detention officers. Mr. Abeyta's symptoms progressed due to his withdrawals, and his cell emergency call button alerted jail staff to his emergency status. However, no guards or medical personnel responded to his emergency. Mr. Abeyta died in his cell after not receiving a response while he was supposedly under "observation" by detention officers in the medical unit of the jail.

86.     On June 28, 2016, Patrick O'Day died at JCDF as a result of complications from opioid withdrawals approximately eight hours after being arrested. Mr. O'Day began having trouble breathing and pressed the emergency call button in his cell. However, no detention officers or medical personnel responded to his emergency. When a guard finally checked on Mr. O'Day, during normal rounds, Mr. O'Day had already stopped breathing and was later pronounced dead.

87.     On January 25, 2020, Zachary Green died while incarcerated at JCDF as a result of a drug overdose. Mr. Green began having trouble breathing and he pressed the emergency call button to alert staff he needed emergency help. However, no detention officers or medical personnel responded to his emergency. Other inmates banged on the doors and called for the detention officers to help Mr. Green. Detention officers found Mr. Green dead in his cell at

14

approximately 8:45 in the morning, which was almost four hours after breakfast was served and almost three hours after the officers began their shift change.

88.	On March 2, 2015, Jennifer Lobato died as a result of complications from opioid withdrawals while being detained at JCDF. Soon after entering the jail, Ms. Lobato began demonstrating clear signs of withdrawal from methadone, including vomiting profusely. Ms. Lobato's symptoms progressively worsened and she pressed the emergency call button in her cell multiple times. Other inmates banged on the doors and called for the detention officers to help Ms. Lobato. Detention officers refused to respond to provide Ms. Lobato with the medical care she needed. As a result, Ms. Lobato died alone in her cell. Ms. Lobato's estate filed suit against several individual defendants, as well as the municipality and healthcare provider. *Est. of Lobato v. Correct Care Sols., LLC*, Case No. 15-cv-02718-PAB-STV. Jefferson County and the deputy defendants ultimately settled with Ms. Lobato's estate for $2.5 million prior to trial.

89.	Lastly, in *McGill v. Correctional Healthcare Companies, Inc. et al.*, Case No. 1:13-cv-01080-RBJ-BNB, Kenneth McGill sued Jefferson County and Correctional Healthcare Companies ("CHC") after he was denied medical treatment while exhibiting signs of a stroke. Mr. McGill complained to detention officers of dizziness, slurred words, and difficulty maintaining balance. Other inmates observed Mr. McGill as he suffered a stroke, which resulted in him losing muscle control in the right side of his body. Mr. McGill repeatedly pressed the emergency call button in his cell, but detention officers and medical personnel refused and/or failed to respond to provide him with the medical care he needed. The case went to trial and resulted in a plaintiff's verdict for approximately $11 million. The jury found that CHC (now Wellpath) had unconstitutional policies or informal customs regarding their response to medical emergencies.

The jury also found that CHC had constitutionally deficient training and supervision of nurses in JCDF.

90.     Thus, JCDF has developed a practice and/or custom of permitting and acquiescing in its detention officers' disregard of inmate emergencies, including failing to respond to inmate communications about such emergencies, which has culminated in routine failure to address serious medical needs as they reach emergency status.

91.     This handful of publicly known deaths likely represent only a sample of deaths at JCDF that resulted from failures to respond to emergency call button alerts.

92.     These deficient policies and practices – namely, the absence of any policies instructing JCDF detention officers on the proper response to an emergency call button alert and training on the same – permitted an informal custom of ignoring medical emergencies, and acted as the moving force for the constitutional violation in each of these incidents, including Kowalski's death.

93.     Despite all of these instances of substantive, constitutionally-deficient failures to respond to medical emergencies, JCDF has consistently failed to amend its policies and train its detentions officers in line with national standards in the correctional care industry, so that inmates with emergent and serious medical needs have their medical needs addressed promptly and are not denied life-saving medical treatment. This has led to a culture of deliberate indifference by detention officers and supervisors, which is exemplified by the actions of the Jail Defendants here.

94.     JCDF will likely continue this pattern and practice of disregarding inmates' medical emergencies unless required to adopt adequate policies, training, and supervision to respond appropriately to communications about medical emergencies.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. §1983 Eighth Amendment Violation –**
**Deliberate Indifference to Medical Necessity**
(*Against Jail Defendants*)

95.     Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

96.     At all times relevant to the Complaint, Kowalski was in the custody of the JCDF, and detention officers Sergeant Taborsky and Deputies Gonzalez, Johnson, and Bennett (the Jail Defendants) at JCDF were responsible for Kowalski's detention and care.

97.     The Jail Defendants knew or should have known of the risks of failing to respond to the emergency call button being repeatedly pressed and Barajas yelling and pounding on the door when they knew Kowalski was on opioid withdrawal protocol, had passed out and fallen, and had a seizure earlier and was seriously ill.

98.     The Jail Defendants acted with deliberate indifference to Kowalski's obviously serious medical needs and constitutional rights in failing to obtain and provide him with medical treatment in a timely and appropriate fashion. They did so despite his obvious serious medical needs, placing him at risk of substantial physical harm or death.

99.     The acts or omissions of the Jail Defendants were conducted within the scope of their official duties and employment. The acts or omissions of all Defendants were the legal and proximate cause of Mr. Kowalski's death.

100.     The actions of the Jail Defendants as described herein intentionally deprived Kowalski of due process and the rights, privileges, liberties, and immunities secured by the Eighth Amendment to the Constitution of the United States of America, and caused his pain and suffering, death, and other consequential damages.

101.    The Jail Defendants' actions and inaction violated Kowalski's right to be free from cruel and unusual punishment while being incarcerated within the government-run detention facility, and have subjected Kowalski to a deprivation of his rights, privileges and immunities secured by the federal Constitution.

102.    The Jail Defendants' deliberate, intentional, willful and wanton disregard to the obvious, serious medical needs of Kowalski, posed by Defendants' disregard for the physical well-being and life of Kowalski, and the lack of provision of timely or adequate medical care violated Kowalski's rights under the Eighth Amendment to the United States Constitution.

103.    The Jail Defendants' conduct in violating Kowalski's rights as described herein shocks the conscience and is intolerable to society's evolving standards of decency.

104.    Kowalski laid in pain and suffered in his cell as he went into cardiac arrhythmia resulting in complete cardiac arrest as the Jail Defendants engaged in deliberate indifference to his serious medical needs and were the cause of his pain and suffering, death, and other consequential damages.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. §1983 – Failure to Supervise
#### (*Against Defendant Taborsky*)

105.    Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

106.    At all times relevant to this Complaint, Defendant Sergeant Taborsky was the sergeant on duty responsible for overseeing Deputies Gonzalez, Johnson, and Bennett in the performance of their job duties.

107.    Sergeant Taborsky knew that Kowalski was on opioid withdrawal monitoring, had passed out in the shower and seized, and ignored the emergency call button alert being repeatedly activated while Barajas yelled and pounded on the cell door. He had direct knowledge and supervision over detention officers at the critical time Kowalski was dying.

108.    Despite this knowledge, he failed to order detention officers to immediately check on Kowalski and acquiesced in their deliberated indifference to Kowalski's serious medical needs.

109.    Instead of ordering Gonzalez or other deputies to respond to the emergency call alert for Kowalski's cell, and to check on Kowalski, he kept the deputies and/or continued participation in a briefing about an earlier altercation between inmates and then went about his ordinary business.

110.    His actions and/or inactions were intentional and/or reckless in failing to ensure that other deputies appropriately and timely responded to a medical emergency, which placed Kowalski at increased risk of substantial physical harm and death.

111.    His actions and/or inactions were deliberately and recklessly indifferent to Kowalski's serious medical needs as he personally participated in the decision to keep the deputies and not to respond to the emergency call button alert(s), while ignoring Barajas' yelling and pounding on the cell door, and which supervisory indifference increased the duration of the delayed response and contributed to the death of Mr. Kowalski.

112.    Defendant Taborsky's actions and/or inactions in failing to address the emergent and serious medical needs of Kowalski and/or failure to affirmatively supervise deputies to respond promptly and immediately, was a moving force and/or proximate cause of the violations of Kowalski's constitutional rights and injuries he suffered leading to death.

### THIRD CLAIM FOR RELIEF
*Common Law Negligence*
**(Against Medical Defendants and Wellpath, LLC)**

113.    Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

114.    At the times relevant to this Complaint, Wellpath, LLC employed Defendants Messer, Salazar, and Mancha and was responsible for their acts and/or omissions under the doctrine of *respondeat superior*.

115.    Defendant Wellpath has failed to enact sufficient or appropriate policies, practices, training, record-keeping, or communication regarding inmate health needs to treat and provide appropriate care regarding inmate medical issues in a timely and/or reasonably comprehensive manner.

116.    Defendants Messer, Salazar, and Mancha (the Medical Defendants) each, at different times, failed to provide the care that any medical professional in their position would have provided to Kowalski by not further evaluating and treating him, ignoring his worsening condition, and checking on him at appropriate times.

117.    Defendants failed to employ appropriate medical equipment, tests, and referrals necessary to sufficiently and timely recognize and/or treat serious inmate medical issues, such as Kowalski passing out, falling, and seizing, in conjunction with his known condition of being in opioid withdrawal.

118.    Defendants failed to act in accordance with an appropriate standard of care to properly diagnose, treat, and otherwise provide Kowalski with appropriate and timely medical care.

119.    Defendants failed to follow JCDF standards requiring the timely monitoring of Mr. Kowalski three times per day, at 7-hour intervals.

120.    Defendants breached their duty of care to Kowalski by negligently failing to appropriately review, evaluate and treat Kowalski's health condition after he exhibited signs of medical distress and complained of medical problems that required serious medical attention after he passed out, fell, and seized in the shower.

121.    Defendants Wellpath breached its duty of care to jail inmates, including Kowalski, by negligently training and supervising medical staff with regard to disease, symptoms of a disease, recognizing signs of the life-threatening-illness(es), and responding appropriately so that medical care, follow up care, medication, and/or proper attention could be readily provided to inmates who complained of and suffered from the type of medical problems of which Kowalski suffered.

122.    Defendants had information and personal knowledge regarding the need to recognize and/or treat serious inmate medical issues, such as Kowalski passing out, falling, and seizing with the additional condition of him being in opioid withdrawal and the negligence that made injury to Kowalski and other inmates likely. However, these Defendants willfully, wantonly, and affirmatively acted or refused to act in reckless disregard for the rights and safety of the inmates, including Kowalski.

123.    As the direct and proximate result of Defendants' actions and omissions and failure to act in accordance with appropriate standards of care and established National and Colorado corrections standards, Kowalski laid in pain and suffered in his cell as he went into cardiac

21

arrhythmia resulting in complete cardiac arrest. Defendants' acts and/or omissions were the cause of his pain and suffering, death, and other consequential damages.

**WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment in his favor and against all Defendants for compensatory damages, as referenced above, for punitive damages, for interest as allowed by law, for costs, expert witness fees, and reasonable attorney fees as allowed by statute or as otherwise allowed by law, pre and post-judgment interest, and for any other and further relief that this Court shall deem just and proper.

## PLAINTIFF REQUESTS A JURY TRIAL ON ALL ISSUES SO TRIABLE

Respectfully submitted this 10th day of January, 2022.

/s/ Rachel B. Maxam

Raymond K. Bryant, #42586
Rachel B. Maxam, #47711
Zach Shiffler,  #54146
Civil Rights Litigation Group, PLLC
1543 Champa Street, Suite 400
Denver, CO 80202
Phone: 720-515-6165
Fax: 720-465-1975
Email: raymond@rightslitigation.com
Email: rachel@rightslitigation.com
Email: zach@rightslitigation.com

*Attorneys for Plaintiff*

22